William BREHM and Geraldine Brehm, as Trustees and Custodians; Michael Grening; Richard Kaplan and David Kaplan, as Trustees; Thomas M. Malloy; Richard J. Kager and Carol R. Kager, as Joint Tenants; Michael Caesar, as Trustee for Howard Gunty, Inc., Profit Sharing Plan; Robert S. Goldberg, I.R.A.; Michael Shore; Michele De Bendictis; Peter Lawrence, I.R.A.; Melvin Zupnick; Judith B. Wohl, I.R.A.; James C. Hays; and Barnett Stepak, Plaintiffs Below, Appellants,

v.

Michael D. EISNER, Michael S. Ovitz, Stephen F. Bollenbach, Reveta F. Bowers, Roy E. Disney, Stanley P. Gold, Sanford M. Litvack, Ignacio E. Lozano, Jr., George J. Mitchell, Thomas S. Murphy, Richard A. Nunis, Leo J. O'Donovan, Sidney Poitier, Irwin E. Russell, Robert A.M. Stern, E. Cardon Walker, Raymond L. Watson and Gary L. Wilson, Defendants Below, Appellees.

and

The Walt Disney Company, Nominal Defendant Below, Appellee.

No. 469, 1998.

Supreme Court of Delaware.

Submitted: Sept. 14, 1999.
Decided: Feb. 9, 2000.

**248**

Joseph A. Rosenthal, Kevin Gross, Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware; Steven G. Schulman (argued), Edith M. Kallas, U. Seth Ottensoser, Milberg Weiss Bershad Hynes & Lerach, New York City, for appellants.

R. Franklin Balotti (argued), Anne C. Foster, Srinivas M. Raju, Peter B. Ladig, Richards, Layton and Finger, Wilmington, Delaware, for director appellees.

David C. McBride, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; Ronald L. Olson, George M. Garvey, Mark H. Epstein (argued) Munger, Tolles & Olson, Los Angeles, California, for appellee Ovitz.

Andre G. Bouchard, Joel Friedlander, Bouchard, Friedlander & MaloneyHuss, Wilmington, Delaware; Edward J. Nowak, Jay S. Handlin, Burbank, California; David S. McLeod, John P. Flynn, Dewey Ballantine, Los Angeles, California, for appellee The Walt Disney Company.

Stuart M. Grant, Jay W. Eisenhofer, Megan D. McIntyre, Grant & Eisenhofer, Wilmington, Delaware, for Amicus Curiae Council of Institutional Investors.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en Banc.

VEASEY, Chief Justice:

In this appeal from the Court of Chancery, we agree with the holding of the Court of Chancery that the stockholder derivative Complaint[1] was subject to dismissal for failure to set forth particularized facts creating a reasonable doubt that the director defendants were disinterested and independent or that their conduct was protected by the business judgment rule.[2] Our affirmance, however, is in part based on a somewhat different analysis than that of the Court below or the parties. Accordingly, in the interests of justice, we reverse only to the extent of providing that one aspect of the dismissal shall be without prejudice, and we remand to the Court of Chancery to provide plaintiffs a reasonable opportunity to file a further amended complaint consistent with this opinion.

The claims before us are that: (a) the board of directors of The Walt Disney Company ("Disney") as it was constituted in 1995 (the "Old Board") breached its fiduciary duty in approving an extravagant and wasteful Employment Agreement of Michael S. Ovitz as president of Disney; (b) the Disney board of directors as it was constituted in 1996 (the "New Board") breached its fiduciary duty in agreeing to a "non-fault" termination of the Ovitz Employment Agreement, a decision that was

---

1. According to the docket entries in the Court of Chancery for C.A. No. 15452, the original complaint was filed on January 8, 1997. After some procedural steps that are not relevant to this appeal, an amended complaint was filed on May 28, 1997, apparently by agreement among the parties and in full substitution for the Complaint filed in the constituent actions. It is this amended complaint that was dismissed with prejudice by the Court of Chancery. We will, for convenience, refer to it as "the Complaint."

2. See *In re The Walt Disney Co. Derivative Litig.*, Del.Ch., 731 A.2d 342, 350–65, 380 (1998).

extravagant and wasteful; and (c) the directors were not disinterested and independent.[3]

■ The Complaint, consisting of 88 pages and 285 paragraphs, is a pastiche of prolix invective. It is permeated with conclusory allegations of the pleader and quotations from the media, mostly of an editorial nature (even including a cartoon). A pleader may rely on factual statements in the media as some of the "tools at hand"[4] from which the pleader intends to derive the particularized facts necessary to comply with Chancery Rule 11(b)(3) and Chancery Rule 23.1. But many of the quotations from the media in the Complaint simply echo plaintiffs' conclusory allegations. Accordingly, they serve no purpose other than to complicate the work of reviewing courts.

This is potentially a very troubling case on the merits. On the one hand, it appears from the Complaint that: (a) the compensation and termination payout for Ovitz were exceedingly lucrative, if not luxurious, compared to Ovitz' value to the Company; and (b) the processes of the boards of directors in dealing with the approval and termination of the Ovitz Employment Agreement were casual, if not sloppy and perfunctory. On the other hand, the Complaint is so inartfully drafted that it was properly dismissed under our pleading standards for derivative suits. From what we can ferret out of this deficient pleading, the processes of the Old Board and the New Board were hardly paradigms of good corporate governance practices. Moreover, the sheer size of the payout to Ovitz, as alleged, pushes the envelope of judicial respect for the business judgment of directors in making compensation decisions. Therefore, both as to

the processes of the two Boards and the waste test, this is a close case.

But our concerns about lavish executive compensation and our institutional aspirations that boards of directors of Delaware corporations live up to the highest standards of good corporate practices do not translate into a holding that these plaintiffs have set forth particularized facts excusing a pre-suit demand under our law and our pleading requirements.

This appeal presents several important issues, including: (1) the scope of review that this Court applies to an appeal from the dismissal of a derivative suit; (2) the extent to which the pleading standards required by Chancery Rule 23.1 exceed those required by Rule 8 of that Court; and (3) the scope of the business judgment rule as it interacts with the relevant pleading requirements. To some extent, the principles enunciated in this opinion restate and clarify our prior jurisprudence.

### *Facts*

This statement of facts is taken from the Complaint. We have attempted to summarize here the essence of Plaintiffs' factual allegations on the key issues before us, disregarding the many conclusions that are not supported by factual allegations.

#### A. The 1995 Ovitz Employment Agreement

By an agreement dated October 1, 1995, Disney hired Ovitz as its president. He was a long-time friend of Disney Chairman and CEO Michael Eisner. At the time, Ovitz was an important talent broker in Hollywood. Although he lacked experience managing a diversified public company, other companies with entertainment operations had been interested in hiring him for high-level executive positions.

---

**3.** The Complaint sets forth other claims decided by the Court of Chancery. These included a disclosure claim along with contract and other claims against Ovitz. *See In re The Disney Co. Derivative Litig.*, 731 A.2d at 365–80. No appeal was taken from the judgment of the Court of Chancery dismissing those

claims with prejudice. Thus, those claims are not before us and the dismissal is final as to them.

**4.** *See Rales v. Blasband,* Del.Supr., 634 A.2d 927, 935 n. 10 (1993).

The Employment Agreement was unilaterally negotiated by Eisner and approved by the Old Board. Their judgment was that Ovitz was a valuable person to hire as president of Disney, and they agreed ultimately with Eisner's recommendation in awarding him an extraordinarily lucrative contract.

Ovitz' Employment Agreement had an initial term of five years and required that Ovitz "devote his full time and best efforts exclusively to the Company," with exceptions for volunteer work, service on the board of another company, and managing his passive investments.[5] In return, Disney agreed to give Ovitz a base salary of $1 million per year, a discretionary bonus, and two sets of stock options (the "A" options and the "B" options) that collectively would enable Ovitz to purchase 5 million shares of Disney common stock.

The "A" options were scheduled to vest in three annual increments of 1 million shares each, beginning on September 30, 1998 (i.e., at the end of the third full year of employment) and continuing for the following two years (through September 2000). The agreement specifically provided that the "A" options would vest immediately if Disney granted Ovitz a non-fault termination of the Employment Agreement. The "B" options, consisting of 2 million shares, differed in two important respects. Although scheduled to vest annually starting in September 2001 (i.e., the year *after* the last "A" option would vest), the "B" options were conditioned on Ovitz and Disney first having agreed to extend his employment beyond the five-year term of the Employment Agreement. Furthermore, Ovitz would forfeit the right to qualify for the "B" options if his initial employment term of five years ended prematurely for any reason, even if from a non-fault termination.

The Employment Agreement provided for three ways by which Ovitz' employment might end. He might serve his five years and Disney might decide against offering him a new contract. If so, Disney would owe Ovitz a $10 million termination payment.[6] Before the end of the initial term, Disney could terminate Ovitz for "good cause" only if Ovitz committed gross negligence or malfeasance, or if Ovitz resigned voluntarily. Disney would owe Ovitz no additional compensation if it terminated him for "good cause." Termination without cause (non-fault termination) would entitle Ovitz to the present value of his remaining salary payments through September 30, 2000, a $10 million severance payment, an additional $7.5 million for each fiscal year remaining under the agreement, and the immediate vesting of the first 3 million stock options (the "A" Options).

Plaintiffs allege that the Old Board knew that Disney needed a strong second-in-command. Disney had recently made several acquisitions, and questions lingered about Eisner's health due to major heart surgery. The Complaint further alleges that "Eisner had demonstrated little or no capacity to work with important or well-known subordinate executives who wanted to position themselves to succeed him," citing the departures of Disney executives Jeffrey Katzenberg, Richard Frank, and Stephen Bollenbach as examples. Thus, the Board knew that, to increase the chance for long-term success, it had to take extra care in reviewing a decision to hire Disney's new president.

But Eisner's decision that Disney should hire Ovitz as its president was not entirely well-received. When Eisner told three members of the Old Board in mid-August 1995 that he had decided to hire Ovitz, all three "denounced the decision." Although

---

**5.** The agreement implicitly emphasized the importance of having Disney receive Ovitz' full attention by mentioning, in a section stating the unique nature of Ovitz' services, that the Company would specifically be entitled to

equitable relief if Ovitz failed to provide it with "the exclusivity of his services."

**6.** All the "A" options would have vested, but he would not receive the "B" options.

not entirely clear from the Complaint, the vote of the Old Board approving the Ovitz Employment Agreement two months later appears to have been unanimous. Aside from a conclusory attack that the Old Board followed Eisner's bidding, the Complaint fails to allege any particularized facts that the three directors changed their initial reactions through anything other than the typical process of further discussion and individual contemplation.

The Complaint then alleges that the Old Board failed properly to inform itself about the total costs and incentives of the Ovitz Employment Agreement, especially the severance package. This is the key allegation related to this issue on appeal. Specifically, plaintiffs allege that the Board failed to realize that the contract gave Ovitz an incentive to find a way to exit the Company via a non-fault termination as soon as possible because doing so would permit him to earn more than he could by fulfilling his contract. The Complaint alleges, however, that the Old Board had been advised by a corporate compensation expert, Graef Crystal, in connection with its decision to approve the Ovitz Employment Agreement. Two public statements by Crystal form the basis of the allegation that the Old Board failed to consider the incentives and the total cost of the severance provisions, but these statements by Crystal were not made until after Ovitz left Disney in December 1996, approximately 14½ months after being hired.

The first statement, published in a December 23, 1996 article in the web-based magazine *Slate*, quoted Crystal as saying, in part, "Of course, the overall costs of the package would go up sharply in the event of Ovitz's termination (*and I wish now that I'd made a spreadsheet showing just what the deal would total if Ovitz had been fired at any time*)."[7] The second published statement appeared in an article about three weeks later in the January 13, 1997

edition of *California Law Business*. The article appears first to paraphrase Crystal: "With no one expecting failure, the sleeper clauses in Ovitz's contract seemed innocuous, Crystal says, explaining that no one added up the total cost of the severance package." The article then quotes Crystal as saying that the amount of Ovitz' severance was "shocking" and that "*[n]obody quantified this and I wish we had.*"[8] One of the charging paragraphs of the Complaint concludes:

> 57. As has been conceded by Graef Crystal, the executive compensation consultant who advised the Old Board with respect to the Ovitz Employment Agreement, the Old Board *never* considered the costs that would be incurred by Disney in the event Ovitz was terminated from the Company for a reason other than cause prior to the natural expiration of the Ovtiz Employment Agreement.

Although repeated in various forms in the Complaint, these quoted admissions by Crystal constitute the extent of the factual support for the allegation that the Old Board failed properly to consider the severance elements of the agreement. This Court, however, must juxtapose these allegations with the legal presumption that the Old Board's conduct was a proper exercise of business judgment. That presumption includes the statutory protection for a board that relies in good faith on an expert advising the Board.[9] We must decide whether plaintiffs' factual allegations, if proven, would rebut that presumption.

### B. The New Board's Actions in Approving the Non–Fault Termination

Soon after Ovitz began work, problems surfaced and the situation continued to deteriorate during the first year of his employment. To support this allegation,

---

7. Emphasis is in the Complaint.

8. Emphasis is in the Complaint.

9. *See* 8 *Del.C.* § 141(e), quoted *infra* at note 51.

the plaintiffs cite various media reports detailing internal complaints and providing external examples of alleged business mistakes. The Complaint uses these reports to suggest that the New Board had reason to believe that Ovitz' performance and lack of commitment met the gross negligence or malfeasance standards of the termination-for-cause provisions of the contract.

The deteriorating situation, according to the Complaint, led Ovitz to begin seeking alternative employment and to send Eisner a letter in September 1996 that the Complaint paraphrases as stating his dissatisfaction with his role and expressing his desire to leave the Company.[10] The Complaint also admits that Ovitz would not actually resign before negotiating a non-fault severance agreement because he did not want to jeopardize his rights to a lucrative severance in the form of a "non-fault termination" under the terms of the 1995 Employment Agreement.

On December 11, 1996, Eisner and Ovitz agreed to arrange for Ovitz to leave Disney on the non-fault basis provided for in the 1995 Employment Agreement. Eisner then "caused" the New Board [11] "to rubber-stamp his decision (by 'mutual consent')." This decision was implemented by a December 27, 1996 letter to Ovitz from defendant Sanford M. Litvack, an officer and director of Disney. That letter stated:

> This will confirm the terms of your agreement with the Company as follows:
> 1. The Term of your employment under your existing Employment Agreement with The Walt Disney Company will end at the close of business today. Consequently, your signature confirms

the end of your service as an officer, and your resignation as a director, of the Company and its affiliates.

> 2. This letter will for all purposes of the Employment Agreement be treated as a "Non–Fault Termination." By our mutual agreement, the total amount payable to you under your Employment Agreement, including the amount payable under Section 11(c) in the event of a "Non–Fault Termination," is $38,888,-230.77, net of withholding required by law or authorized by you. By your signature on this letter, you acknowledge receipt of all but $1,000,000 of such amount. Pursuant to our mutual agreement, this will confirm that payment of the $1,000,000 balance has been deferred until February 5, 1997, pending final settlement of accounts.
>
> 3. This letter will further confirm that the option to purchase 3,000,000 shares of the Company's Common Stock granted to you pursuant to Option A described in your Employment Agreement will vest as of today and will expire in accordance with its terms on September 30, 2002.

Although the non-fault termination left Ovitz with what essentially was a very lucrative severance agreement, it is important to note that Ovitz and Disney had negotiated for that severance payment at the time they initially contracted in 1995, and in the end the payout to Ovitz did not exceed the 1995 contractual benefits. Consequently, Ovitz received the $10 million termination payment, $7.5 million for part of the fiscal year remaining under the

---

**10.** The plaintiffs allegedly have never seen the actual letter.

**11.** The composition of the New Board differed slightly from the composition of the Old Board. The Old Board and the New Board both included Michael D. Eisner, Roy E. Disney, Stanley P. Gold, Sanford M. Litvack, Richard A. Nunis, Sidney Poitier, Irwin E. Russell, Robert A.M. Stern, E. Cardon Walker, Raymond L. Watson, Gary L. Wilson, Reveta F. Bowers, Ignacio E. Lozano Jr. and

George J. Mitchell. The Old Board included Stephen F. Bollenbach, who was not on the New Board. The New Board included Leo J. O'Donovan and Thomas S. Murphy, neither of whom was on the Old Board. Although the Complaint included Ovitz as a member of the New Board, his resignation appeared to have occurred before the New Board approved the non-fault termination. *See In re The Walt Disney Co. Derivative Litig.*, 731 A.2d at 351 n. 3.

agreement and the immediate vesting of the 3 million stock options (the "A" options). As a result of his termination Ovitz would not receive the 2 million "B" options that he would have been entitled to if he had completed the full term of the Employment Agreement and if his contract were renewed.[12]

The Complaint charges the New Board with waste, computing the value of the severance package agreed to by the Board at over $140 million, consisting of cash payments of about $39 million and the value of the immediately vesting "A" options of over $101 million. The Complaint quotes Crystal, the Old Board's expert, as saying in January 1997 that Ovitz' severance package was a "shocking amount of severance."

The allegation of waste is based on the inference most favorable to plaintiffs that Disney owed Ovitz nothing, either because he had resigned (*de facto*) or because he was unarguably subject to firing for cause. These allegations must be juxtaposed with the presumption that the New Board exercised its business judgment in deciding how to resolve the potentially litigable issues of whether Ovitz had actually resigned or had definitely breached his contract. We must decide whether plaintiffs' factual allegations, if proven, would rebut that presumption.

### Scope of Review

■ Certain dicta in our jurisprudence suggest that this Court will review under a deferential abuse of discretion standard a decision of the Court of Chancery on a Rule 23.1 motion to dismiss a derivative suit. These statements, apparently beginning in 1984 in *Aronson v. Lewis,* state that the Court of Chancery's decision is discretionary in determining whether the allegations of the complaint support the contention that pre-suit demand is excused.

Our view is that in determining demand futility the Court of Chancery *in the proper exercise of its discretion* must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.[13]

By implication, therefore, these dicta would suggest that our review is deferential, limited to a determination of whether the Court of Chancery abused its discretion. Indeed, all parties to this appeal agree that our review is for abuse of discretion.

The view we express today, however, is designed to make clear that our review of decisions of the Court of Chancery applying Rule 23.1 is *de novo* and plenary. We apply the law to the allegations of the Complaint as does the Court of Chancery. Our review is not a deferential review that requires us to find an abuse of discretion. We see no reason to perpetuate the concept of discretion in this context. The nature of our analysis of a complaint in a derivative suit is the same as that applied by the Court of Chancery in making its decision in the first instance.

Analyzing a pleading for legal sufficiency is not, for example, the equivalent of the

---

**12.** Under the 1995 Employment Agreement, Ovitz' "B" options to purchase 2,000,000 shares were scheduled to vest "in increments of 1,000,000 shares on each of September 30, 2001 and September 30, 2002." But they would not vest if Ovitz' employment "shall have terminated for any reason whatsoever more than three months prior to such scheduling date." If Ovitz' employment should terminate before October 1, 2000 (the expiration of the 1995 agreement), the "B" options "shall thereupon irrevocably terminate."

**13.** *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984) (emphasis added). This language in *Aronson* was followed, sequentially, by: *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 624–25 (1984); *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 186 (1988); *Levine v. Smith,* Del.Supr., 591 A.2d 194, 207 (1991); *Heineman v. Datapoint Corp.,* Del.Supr., 611 A.2d 950, 952 (1992); *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1217 n. 15 (1996); and *Scattered Corp. v. Chicago Stock Exch.,* Del.Supr., 701 A.2d 70, 72–73 (1997).

deferential review of certain discretionary rulings, such as: an administrative agency's findings of fact;[14] a trial judge's evaluation of witness credibility;[15] findings of the Court of Chancery in a statutory stock appraisal;[16] a decision whether to grant or deny injunctive relief or the scope of that relief;[17] or what rate of interest to apply.[18] In a Rule 23.1 determination of pleading sufficiency, the Court of Chancery, like this Court, is merely reading the English language of a pleading and applying to that pleading statutes, case law and Rule 23.1 requirements. To that extent, our scope of review is analogous to that accorded a ruling under Rule 12(b)(6).

Therefore, our scope of review must be *de novo*. To the extent *Aronson* and its progeny contain dicta expressing or suggesting an abuse of discretion scope of review, that language is overruled. We now proceed to decide *de novo* whether the Complaint was properly dismissed for failure to set forth particularized facts to support the plaintiffs' claim that demand is excused.

### Pleading Requirements in Derivative Suits

■ Pleadings in derivative suits are governed by Chancery Rule 23.1,[19] just as

pleadings alleging fraud are governed by Chancery Rule 9(b).[20] Those pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a).[21] Rule 23.1 is not satisfied by conclusory statements or mere notice pleading. On the other hand, the pleader is not required to plead evidence.[22] What the pleader must set forth are particularized factual statements that are essential to the claim. Such facts are sometimes referred to as "ultimate facts," "principal facts" or "elemental facts."[23] Nevertheless, the particularized factual statements that are required to comply with the Rule 23.1 pleading rules must also comply with the mandate of Chancery Rule 8(e) that they be "simple, concise and direct."[24] A prolix complaint larded with conclusory language, like the Complaint here, does not comply with these fundamental pleading mandates.

■ Chancery Rule 23.1 requires, in part, that the plaintiff must allege with particularity facts raising a reasonable doubt that the corporate action being questioned was properly the product of

---

**14.** See *Public Water Supply Co. v. DiPasquale*, Del.Supr., 735 A.2d 378, 381 (1999).

**15.** See *Schock v. Nash*, Del.Supr., 732 A.2d 217, 234 (1999).

**16.** See *M.P.M. Enterprises, Inc. v. Gilbert*, Del. Supr., 731 A.2d 790, 795 (1999).

**17.** See *SI Management L.P. v. Wininger*, Del. Supr., 707 A.2d 37, 40 (1998).

**18.** See *Shell Petroleum, Inc. v. Smith*, Del. Supr., 606 A.2d 112, 117 (1992).

**19.** Rule 23.1 provides, in part: "The complaint shall ... allege with particularity the efforts, if any, ... to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

**20.** Rule 9(b) provides, in part: "In all averments of fraud or mistake, the circumstances

constituting fraud or mistake shall be stated with particularity."

**21.** Rule 8(a) provides, in part: "A pleading ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...."

**22.** See *Aronson*, 473 A.2d at 816.

**23.** Black's Law Dictionary 610–12 (7th ed.1999); see also 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 9.03[1] (3d ed.1999); 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.1.08[1] (3d ed.1999).

**24.** This parallels the pleading rules contained in the Federal Rules of Civil Procedure. See 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 9.03[1][b] at 9–19 (3d ed.1999); Deborah A. DeMott, *Shareholder Derivative Actions: Law and Practice* § 4:02, at 41 (1999 Cum.Supp.).

business judgment.[25] The rationale of Rule 23.1 is two-fold. On the one hand, it would allow a plaintiff to proceed with discovery and trial if the plaintiff complies with this rule and can articulate a reasonable basis to be entrusted with a claim that belongs to the corporation. On the other hand, the rule does not permit a stockholder to cause the corporation to expend money and resources in discovery and trial in the stockholder's quixotic pursuit of a purported corporate claim based solely on conclusions, opinions or speculation. As we stated in *Grimes v. Donald:*

> The demand requirement serves a salutary purpose. First, by requiring exhaustion of intracorporate remedies, the demand requirement invokes a species of alternative dispute resolution procedure which might avoid litigation altogether. Second, if litigation is beneficial, the corporation can control the proceedings. Third, if demand is excused or wrongfully refused, the stockholder will normally control the proceedings.
>
> The jurisprudence of *Aronson* and its progeny is designed to create a balanced environment which will: (1) on the one hand, deter costly, baseless suits by creating a screening mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms; and (2) on the other hand, permit suit by a stockholder who is able to articulate particularized facts showing that there is a reasonable doubt either that (a) a majority of the board is independent for purposes of responding to the demand, or (b) the underlying transaction is protected by the business judgment rule.[26]

In setting up its analysis of the amended complaint, the Court of Chancery in this case stated that the standard by which the Complaint is to be tested is as follows: "Where under any set of facts consistent with the facts alleged in the complaint the plaintiff *would not be entitled* to judgment, the complaint *may be dismissed* as legally defective." [27] The Court attempted to paraphrase the Court of Chancery decision in *Lewis v. Vogelstein* for this formulation. The *Vogelstein* quote is that "[w]here under any state of facts consistent with the factual allegations of the complaint the plaintiff *would be entitled* to a judgment, the complaint *may not be dismissed* as legally defective." [28]

■ Plaintiffs argue that the formulation used by the Court of Chancery was error in that it is the opposite of the *Vogelstein* formulation. Defendants, on the other hand, argue that the formulations are identical. We need not resolve what is essentially a semantic debate. In our view, the formulation by the Court of Chancery here is confusing and unhelpful, but not reversible error, particularly in light of our *de novo* review. The issue is whether plaintiffs have alleged particularized facts creating a reasonable doubt that the actions of the defendants were protected by the business judgment rule. Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences.

### Principles of Corporation Law Compared with Good Corporate Governance Practices

This is a case about whether there should be personal liability of the directors of a Delaware corporation to the corporation for lack of due care in the decision-making process and for waste of corporate assets. This case is not about the failure

---

**25.** This is the so-called second prong of *Aronson,* the central focus of this case.

**26.** *Grimes,* 673 A.2d at 1216–17 (footnotes omitted).

**27.** *In re The Walt Disney Co. Derivative Litig.,* 731 A.2d at 353 (emphasis added).

**28.** *Lewis v. Vogelstein,* Del.Ch., 699 A.2d 327, 338 (1997) (emphasis added).

of the directors to establish and carry out ideal corporate governance practices.

■ All good corporate governance practices include compliance with statutory law and case law establishing fiduciary duties. But the law of corporate fiduciary duties and remedies for violation of those duties are distinct from the aspirational goals of ideal corporate governance practices. Aspirational ideals of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of the corporation law are highly desirable, often tend to benefit stockholders, sometimes reduce litigation and can usually help directors avoid liability. But they are not required by the corporation law and do not define standards of liability.[29]

The inquiry here is not whether we would disdain the composition, behavior and decisions of Disney's Old Board or New Board as alleged in the Complaint if we were Disney stockholders. In the absence of a legislative mandate,[30] that determination is not for the courts. That deci-

sion is for the stockholders to make in voting for directors, urging other stockholders to reform or oust the board, or in making individual buy-sell decisions involving Disney securities. The sole issue that this Court must determine is whether the particularized facts alleged in this Complaint provide a reason to believe that the conduct of the Old Board in 1995 and the New Board in 1996 constituted a violation of their fiduciary duties.

### Independence of the Disney Board

■ The test of demand futility is a two-fold test under *Aronson* and its progeny. The first prong of the futility rubric is "whether, under the particularized facts alleged, a reasonable doubt is created that ... the directors are disinterested and independent."[31] The second prong is whether the pleading creates a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment."[32] These prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused.[33]

29. *See id.* at 332; *see also* E. Norman Veasey, *An Economic Rationale for Judicial Decision-making in Corporate Law,* 53 Bus.Law. 681, 699–700 (1998) (listing seven suggestions of aspirational norms for good corporate practice that are "purely precatory" and do "not foreshadow how any case should be decided," but "may be in the nature of safe harbors in certain circumstances"). For example, the Complaint quotes a *Wall Street Journal* article critical of the Board's functioning: the directors own little stock; they do not "hold a regular retreat"; they "don't meet regularly in the absence of company executives such as Mr. Eisner"; and they do not "give Mr. Eisner a written assessment of his performance" as do "89% of the nation's biggest industrial corporations." These are very desirable practices to be sure, but they are not required by the corporation law.

30. *See Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1385 n. 36 (1996) (noting that this court will not impose requirements or exceptions that are essentially legislative because that is the province of the General Assembly and further because it would "introduce an undesirable degree of uncertainty into the corporation law"). For example, the Council of Institutional Investors, an eminently prestigious corporate governance organization, has ar-

gued in a very interesting *amicus* brief in this Court that the Disney Board should have taken steps to assure even greater independence of directors. *See also* National Association of Corporate Directors, *Report of the NACD Blue Ribbon Commission on Director Professionalism* 7–14, 37–40 (1996) (containing definitions of independence from this very influential organization and urging corporations to insist on paradigms of strengthened independence); American Law Institute, *Principles of Corporate Governance* § 3A–01 (1992) ("Composition of the Board of Publicly Held Corporations"). Many of the recommendations of the Council of Institutional Investors, the American Law Institute and the NACD are desirable but are not mandated by our law.

31. *Aronson,* 473 A.2d at 814; *see also id.* at 816 ("Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.").

32. *Id.* at 814.

33. For an excellent analysis of the Delaware demand rule in this context, see 2 Dennis J. Block et al., *The Business Judgment Rule* 1467–1543 (5th ed.1998).

In this case, the issues of disinterestedness and independence involved in the first prong of *Aronson* are whether a majority of the New Board, which presumably was in office when plaintiffs filed this action, was disinterested and independent. That is, were they incapable, due to personal interest or domination and control, of objectively evaluating a demand, if made, that the Board assert the corporation's claims that are raised by plaintiffs or otherwise remedy the alleged injury?[34] This rule is premised on the principle that a claim of the corporation should be evaluated by the board of directors to determine if pursuit of the claim is in the corporation's best interests.[35] That is the analysis the Court of Chancery brought to bear on the matter,[36] and it is that analysis we now examine to the extent necessary for appropriate appellate review.

■ The facts supporting plaintiffs' claim that the New Board was not disinterested or independent turn on plaintiffs' central allegation that a majority of the Board was beholden to Eisner. It is not alleged that they were beholden to Ovitz. Plaintiffs' theory is that Eisner was advancing Ovitz' interests primarily because a lavish contract for Ovtiz would redound to Eisner's benefit since Eisner would thereby gain in his quest to have his own compensation increased lavishly. This theory appears to be in the nature of the old maxim that a "high tide floats all boats." But, in the end, this theory is not supported by well-pleaded facts, only conclusory allegations. Moreover, the Court of Chancery found that these allegations were illogical and counterintuitive:

Plaintiffs' allegation that Eisner was interested in maximizing his compensation at the expense of Disney and its shareholders cannot reasonably be inferred from the facts alleged in Plaintiffs' amended complaint. At all times material to this litigation, Eisner owned several million options to purchase Disney stock. Therefore, it would not be in Eisner's economic interest to cause the Company to issue millions of additional options unnecessarily and at considerable cost. Such a gesture would not, as Plaintiffs suggest, "maximize" Eisner's own compensation package. Rather, it would dilute the value of Eisner's own very substantial holdings. Even if the impact on Eisner's option value were relatively small, such a large compensation package would, and did, draw largely negative attention to Eisner's own performance and compensation. Accordingly, no reasonable doubt can exist as to Eisner's disinterest in the approval of the Employment Agreement, as a matter of law. Similarly, the Plaintiffs have not demonstrated a reasonable doubt that Eisner was disinterested in granting Ovitz a Non–Fault Termination, thus allowing Ovitz to receive substantial severance benefits under the terms of the Employment Agreement. Nothing alleged by Plaintiffs generates a reasonable inference that Eisner would benefit personally from allowing

34. It is no answer to say that demand is necessarily futile because (a) the directors "would have to sue themselves, thereby placing the conduct of the litigation in hostile hands," or (b) that they approved the underlying transaction. *See Aronson*, 473 A.2d at 817–18; *see also* Block, *supra* note 33.

35. *See* Dennis J. Block et al., *Derivative Litigation: Current Law Versus the American Law Institute*, 48 Bus.Law. 1443, 1444 (1993) ("[C]ourts both in and out of Delaware have ruled with near unanimity .... that the business judgment rule is the appropriate standard of judicial review in cases where an independent majority of a corporation's board of directors determines that litigation on behalf of the corporation will not serve the best interests of the corporation.").

36. *See In re The Walt Disney Co. Derivative Litig.*, 731 A.2d at 354–56. The independence and disinterestedness of the Old Board in authorizing the Ovitz Employment Agreement and the New Board in authorizing a non-fault termination of that agreement is subsumed in the business judgment rule analysis of those issues under the second prong of *Aronson*. *See Aronson*, 473 A.2d at 815.

Ovitz to leave Disney without good cause.[37]

The Court of Chancery held that "no reasonable doubt can exist as to Eisner's disinterest in the approval of the Employment Agreement, as a matter of law," and similarly that plaintiffs "have not demonstrated a reasonable doubt that Eisner was disinterested in granting Ovitz a Non–Fault Termination." [38] Plaintiffs challenge this conclusion, but we agree with the Court of Chancery and we affirm that holding.

The Complaint then proceeds to detail the various associations that each member of the New Board had with Eisner. In an alternative holding, the Court of Chancery proceeded meticulously to analyze each director's ties to Eisner to see if they could have exercised business judgment independent of Eisner.[39] Because we hold that the Complaint fails to create a reasonable doubt that Eisner was disinterested in the Ovitz Employment Agreement, we need not reach or comment on the analysis of the Court of Chancery on the independence of the other directors for this purpose.[40]

█ In this case, therefore, that part of plaintiffs' Complaint raising the first prong of *Aronson,* even though not pressed by plaintiffs in this Court,[41] has been dismissed with prejudice. Our affir-

mance of that dismissal is final and dispositive of the first prong of *Aronson.*[42] We now turn to the primary issues in this case that implicate the second prong of *Aronson:* whether the Complaint sets forth particularized facts creating a reasonable doubt that the decisions of the Old Board and the New Board were protected by the business judgment rule.

## Analytical Framework for the Informational Component of Directorial Decisionmaking

Plaintiffs claim that the Court of Chancery erred when it concluded that a board of directors is "not required to be informed of every fact, but rather is required to be reasonably informed." [43] Applying that conclusion, the Court of Chancery held that the Complaint did not create a reasonable doubt that the Old Board had satisfied the requisite informational component when it approved the Ovitz contract in 1995.[44] In effect, Plaintiffs argue that being "reasonably informed" is too lax a standard to satisfy Delaware's legal test for the informational component of board decisions. They contend that the Disney directors on the Old Board did not avail themselves of all material information reasonably available in approving Ovitz' 1995

---

**37.** *In re The Walt Disney Co. Derivative Litig.,* 731 A.2d at 355–56.

**38.** *Id.*

**39.** *See In re The Walt Disney Co. Derivative Litig.,* 731 A.2d at 356–61.

**40.** Thus, we need not address the very interesting arguments and recommendations of the *amicus* brief filed on behalf of the Council of Institutional Investors.

**41.** Apparently plaintiffs, as appellants in this Court, lacked a motivation to have us review this issue at all since they do not mention it in their brief. The issue was fully briefed by the *amicus,* the Council of Institutional Investors and by the corporate defendant, Disney. Despite the irregular procedure, *see Turnbull v.*

*Fink,* Del.Supr., 644 A.2d 1322 (1994), we agreed to consider the issue because the deficiency was not raised by the appellees, who were not prejudiced and who fully briefed all issues before us. *See Brehm v. Eisner,* Del. Supr., No. 469, 1998, Walsh, J. (May 25, 1999) (ORDER). This departure from proper practice before this Court is a unique exception and should not be considered a precedent.

**42.** This issue is not one that plaintiffs shall be permitted to relitigate if they elect to file an amended complaint setting forth particularized facts relating to the second prong of *Aronson.*

**43.** *In re The Walt Disney Co. Derivative Litig.,* 731 A.2d at 361–62.

**44.** *See id.*

contract, and thereby violated their fiduciary duty of care.[45]

■ The "reasonably informed" language used by the Court of Chancery here may have been a short-hand attempt to paraphrase the Delaware jurisprudence that, in making business decisions, directors must consider all material information reasonably available, and that the directors' process is actionable only if grossly negligent.[46] The question is whether the trial court's formulation is consistent with our objective test of reasonableness, the test of materiality and concepts of gross negligence. We agree with the Court of Chancery that the standard for judging the informational component of the directors' decisionmaking does not mean that the Board must be informed of *every* fact. The Board is responsible for considering only *material* facts that are *reasonably available*, not those that are immaterial or out of the Board's reasonable reach.[47]

■ We conclude that the formulation of the due care test by the Court of Chancery in this case, while not necessarily inconsistent with our traditional formulation, was too cryptically stated to be a helpful precedent for future cases. Presuit demand will be excused in a derivative suit only if the Court of Chancery in the first instance, and this Court in its *de novo* review, conclude that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence,* included consideration of all material information reasonably available.[48] Thus, we now apply this analytical framework to the particularized facts pleaded, juxtaposed with the presumption of regularity of the Board's process.

### Plaintiffs' Contention that the Old Board Violated the Process Duty of Care in Approving the Ovitz Employment Agreement

■ Certainly in this case the economic exposure of the corporation to the payout scenarios of the Ovitz contract was material, particularly given its large size, for purposes of the directors' decisionmaking process.[49] And those dollar exposure

---

**45.** *See Aronson,* 473 A.2d at 812; *Smith v. Van Gorkom,* Del .Supr., 488 A.2d 858, 872–73 (1985).

**46.** *See Aronson,* 473 A.2d at 812.

**47.** Compare the American Law Institute test, which requires that a director must be "informed ... to the extent the director reasonably believes to be appropriate under the circumstances." *Principles of Corporate Governance, supra* note 30, at § 4.01(c)(2). Because this test also is based on the objective test of reasonableness, it could be argued that it is essentially synonymous with the Delaware test. But there is room to argue that the Delaware test is stricter. *See* Roswell Perkins, *ALI Corporate Governance Project in Midstream,* 41 Bus.Law. 1195, 1210–11 (1986). In the end, the debate may be mostly semantic.

**48.** *See Aronson,* 473 A.2d at 812.

**49.** The term "material" is used in this context to mean relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking. In this sense, it is distinct from the use of the term "material" in the quite different context of disclosure to stockholders in which "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *O'Malley v. Boris,* Del.Supr., 742 A.2d 845, 850 (1999) (quoting *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985)) (reflecting the general federal materiality standard from *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *accord Loudon v. Archer–Daniels–Midland Co.,* Del.Supr., 700 A.2d 135, 143 (1997). One must also keep in mind that the size of executive compensation for a large public company in the current environment often involves huge numbers. This is particularly true in the entertainment industry where the enormous revenues from one "hit" movie or enormous losses from a "flop" place in perspective the compensation of executives whose genius or misjudgment, as the case may be, may have contributed substantially to the "hit" or "flop." *See* Lori B. Marino, Comment, *Executive Compensation and the Misplaced Emphasis on Increasing Shareholder Access to the Proxy,* 147 U.Pa. L.Rev. 1205, 1235 (1999) ("Executive com-

numbers were reasonably available because the logical inference from plaintiffs' allegations is that Crystal or the New Board could have calculated the numbers. Thus, the objective tests of reasonable availability and materiality were satisfied by this Complaint. But that is not the end of the inquiry for liability purposes.

The Court of Chancery interpreted the Complaint to allege that only Crystal (the Board's expert)—and *not the Board itself*—failed to bring to bear all the necessary information because he (Crystal) did not quantify for the Board the maximum payout to Ovitz under the non-fault termination scenario. Alternatively, the Court of Chancery reasoned that even if the Old Board failed to make the calculation, that fact does not raise a reasonable doubt of due care because *Crystal* did not consider it critical to ascertain the potential costs of Ovitz' severance package. The Court's language is as follows:

> With regard to the alleged breach of the duty of care, Plaintiffs claim that the directors were not properly informed before they adopted the Employment Agreement because they did not know the value of the compensation package offered to Ovitz. To that end, Plaintiffs offer several statements made by Graef Crystal, the financial expert who advised the Board on the Employment Agreement, including his admission that "[n]obody quantified the total cost of the severance package and I wish we had."

> The fact that *Crystal* did not quantify the potential severance benefits to Ovitz for terminating early without cause (under the terms of the Employment Agreement) does not create a reasonable inference that *the Board* failed to consider the potential cost to Disney in the event that they decided to terminate

Ovitz without cause. But, even if the Board did fail to calculate the potential cost to Disney, I nevertheless think that this allegation fails to create a reasonable doubt that the former Board exercised due care. Disney's expert did not consider an inquiry into the potential cost of Ovitz's severance benefits to be critical or relevant to the Board's consideration of the Employment Agreement. Merely because Crystal *now* regrets not having calculated the package is not reason enough to overturn the judgment of the Board *then*. It is the essence of the business judgment rule that a court will not apply $^{20}\!/\!_{20}$ hindsight to second guess a board's decision, except "in rare cases [where] a transaction may be so egregious on its face that the board approval cannot meet the test of business judgment." Because the Board's reliance on Crystal and his decision not to fully calculate the amount of severance lack "egregiousness," this is not that rare case. I think it a correct statement of law that the duty of care is still fulfilled even if a Board does not know the exact amount of a severance payout but nonetheless is fully informed about the manner in which such a payout would be calculated. A board is not required to be informed of every fact, but rather is required to be reasonably informed. Here the Plaintiffs have failed to plead facts giving rise to a reasonable doubt that the Board, as a matter of law, was reasonably informed on this issue.[50]

We believe, however, that the Complaint, fairly read, charges that Crystal admitted that "nobody"—not Crystal *and* not the directors—made that calculation, although all the necessary information presumably was at hand to do so. Thus the reading given by the Court of Chancery to

**50.** *In re The Walt Disney Co. Derivative Litig.*, 731 A.2d at 361–62 (emphasis in original) (footnotes omitted).

this aspect of the amended complaint was too restrictive because the Court's reading fails to appreciate the breadth of the allegation—*i.e.*, that neither Crystal nor the Old Board made the calculations that Crystal—the expert—*now* believes he should have made. Moreover, the Court's alternative analysis that "Disney's expert did not consider an inquiry into the potential costs ... to be critical or relevant to the board's consideration" is inappropriately simplistic at the pleading stage to state a comprehensive analysis of the issue.

■ We regard the Court's language as harmless error, however, for the following reason. The Complaint, fairly construed, admits that the directors were advised by Crystal as an expert and that they relied on his expertise. Accordingly, the question here is whether the directors are to be "fully protected" (*i.e.*, not held liable) on the basis that they relied in good faith on a qualified expert under Section 141(e) of the Delaware General Corporation Law.[51] The Old Board is entitled to the presumption[52] that it exercised proper

business judgment, including proper reliance on the expert. In fact, the Court of Chancery refers to the "Board's reliance on Crystal and his decision not to fully calculate the amount of severance."[53] The Court's invocation here of the concept of the protection accorded directors who rely on experts, even though no reference is made to the statute itself, is on the right track, but the Court's analysis is unclear and incomplete.[54]

■ Although the Court of Chancery did not expressly predicate its decision on Section 141(e), Crystal is presumed to be an expert on whom the Board was entitled to rely in good faith under Section 141(e) in order to be "fully protected."[55] Plaintiffs must rebut the presumption that the directors properly exercised their business judgment, including their good faith reliance on Crystal's expertise. What Crystal *now* believes *in hindsight* that he and the Board *should have done* in 1995 does not provide that rebuttal. That is not to say, however, that a rebuttal of the presumption of proper reliance on the ex-

---

**51.** Section 141(e) provides:

A member of the board of *directors*, or a member of any committee designated by the board of directors, *shall*, in the performance of such member's duties, *be fully protected in relying in good faith upon the* records of the corporation and upon such *information, opinions, reports or statements presented to the corporation by* any of the corporation's officers or employees, or committees of the board of directors, or by *any* other *person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care* by or on behalf of the corporation. 8 *Del.C.* § 141(e) (emphasis added). This protection, however, is not without limitation, as in a case of corporate waste.

**52.** *See Grobow*, 539 A.2d at 187–88.

**53.** *In re The Walt Disney Co. Derivative Litig.*, 731 A.2d at 362.

**54.** The Court of Chancery seemed, however, to key the reliance issue not to the statute but to the lack of "egregiousness," a concept that is misplaced in this context. The Court said:

It is the essence of the business judgment rule that a court will not apply $^{20}/_{20}$ hindsight to second guess a board's decision, except "in rare cases [where] a transaction may be so egregious on its face that the board approval cannot meet the test of business judgment." Because the Board's reliance on Crystal and his decision not to fully calculate the amount of severance lack "egregiousness," this is not that rare case. I think it a correct statement of law that the duty of care is still fulfilled even if a Board does not know the exact amount of a severance payout but nonetheless is fully informed about the manner in which such a payout would be calculated. A board is not required to be informed of every fact, but rather is required to be reasonably informed.

*Id.*

**55.** The directors do, however, obliquely cite Section 141(e) and various Delaware cases in a footnote to their brief in this Court. *See* Ans. Br. of Defendants Below–Appellees at 18 n. 10.

pert under Section 141(e) cannot be pleaded consistent with Rule 23.1 in a properly framed complaint setting forth particularized facts creating reason to believe that the Old Board's conduct was grossly negligent.

To survive a Rule 23.1 motion to dismiss in a due care case where an expert has advised the board in its decisionmaking process, the complaint must allege particularized facts (not conclusions) that, if proved, would show, for example, that: (a) the directors did not in fact rely on the expert; (b) their reliance was not in good faith; (c) they did not reasonably believe that the expert's advice was within the expert's professional competence; (d) the expert was not selected with reasonable care by or on behalf of the corporation, and the faulty selection process was attributable to the directors; (e) the subject matter (in this case the cost calculation) that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice; or (f) that the decision of the Board was so unconscionable as to constitute waste or fraud.[56] This Complaint includes no particular allegations of this nature, and therefore it was subject to dismissal as drafted.[57]

Plaintiffs also contend that Crystal's latter-day admission is "valid and binding" on the Old Board. This argument is without merit. Crystal was the Board's expert *ex ante* for purposes of advising the directors on the Ovitz Employment Agreement. He was not their agent *ex post* to make binding admissions.

We conclude that, although the language of the Court of Chancery was flawed in formulating the proper legal test to be used and in its reading of the Complaint, that pleading, as drafted, fails to create a reasonable doubt that the Old Board's decision in approving the Ovitz Employment Agreement was protected by the business judgment rule. Plaintiffs will be provided an opportunity to replead on this issue.

### Plaintiffs' Contention that the Old Board Violated "Substantive Due Care" Requirements and Committed Waste Ab Initio with Ovitz' Employment Agreement

Plaintiffs allege not only that the Old Board committed a procedural due care violation in the process of approving the Ovitz 1995 Employment Agreement but also that the Board committed a "substantive due care" violation constituting waste. They contend that the Court of Chancery erred in holding that the Complaint failed to set forth particularized facts creating a reasonable doubt that the directors' decision to enter into the Ovitz Employment Agreement was a product of the proper exercise of business judgment.

Plaintiffs' principal theory is that the 1995 Ovitz Employment Agreement

---

**56.** To be sure, directors have the power, authority and wide discretion to make decisions on executive compensation. *See* 8 *Del.C.* § 122(5). As the often-cited Court of Chancery decision by Chancellor Seitz in *Saxe v. Brady* warns, there is an outer limit to that discretion, at which point a decision of the directors on executive compensation is so disproportionately large as to be unconscionable and constitute waste. Del.Ch., 184 A.2d 602, 610 (1962); *see Grimes*, 673 A.2d at 1215 (noting that compensation decisions by an independent board are protected by the business judgment rule "unless the facts show that such amounts, compared with the services to be received in exchange, constitute waste or could not otherwise be the product

of a valid exercise of business judgment") (citing *Saxe*, 184 A.2d at 610); *see also* Marino, *supra* note 49, at 1237–45.

**57.** It is no excuse for plaintiffs to argue that they are unable to allege these particularized facts because they are cut off from access to discovery at the pre-suit demand stage of a derivative suit. Plaintiffs have the opportunity to use the "tools at hand" to learn facts relating to Crystal's report and the Board's consideration through an interview with Crystal or by seeking appropriate and precisely identified corporate records in a Section 220 proceeding. *See infra* text accompanying notes 73–75.

was a "wasteful transaction for Disney *ab initio*" because it was structured to "incentivize" Ovitz to seek an early non-fault termination. The Court of Chancery correctly dismissed this theory as failing to meet the stringent requirements of the waste test, *i.e.,* " 'an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.' "[58] Moreover, the Court concluded that a board's decision on executive compensation is entitled to great deference. It is the essence of business judgment for a board to determine if "a 'particular individual warrant[s] large amounts of money, whether in the form of current salary or severance provisions.' "[59]

Specifically, the Court of Chancery inferred from a reading of the Complaint that the Board determined it had to offer an expensive compensation package to attract Ovitz and that they determined he would be valuable to the Company. The Court also concluded that the vesting schedule of the options actually was a disincentive for Ovitz to leave Disney.[60] When he did leave pursuant to the non-fault termination, the Court noted that he left 2 million options (the "B" options) "on the table."[61] Although we agree with the conclusion of the Court of Chancery that this particular Complaint is deficient, we do not foreclose the possibility that a properly framed complaint could pass muster.

▆▆▆▆▆ Plaintiffs' disagreement on appeal with the decision of the Court of Chancery is basically a quarrel with the Old Board's judgment in evaluating Ovitz' worth *vis à vis* the lavish payout to him.

We agree with the analysis of the Court of Chancery that the size and structure of executive compensation are inherently matters of judgment.[62] As former Chancellor Allen stated in *Vogelstein:*

> The judicial standard for determination of corporate waste is well developed. Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky. Any other rule would deter corporate boards from the optimal rational acceptance of risk, for reasons explained elsewhere. Courts are ill-fitted to attempt to weigh the "adequacy" of consideration under the waste standard or, *ex post,* to judge appropriate degrees of business risk.[63]

To be sure, there are outer limits, but they are confined to unconscionable cases where directors irrationally squander or give away corporate assets. Here, however, we

---

**58.** *In re The Walt Disney Co. Derivative Litig.,* 731 A.2d at 362 (quoting *Glazer v. Zapata Corp.,* Del.Ch., 658 A.2d 176, 183 (1993)).

**59.** *Id.* (quoting *Grimes,* 673 A.2d at 1215).

**60.** *See id.* at 362–63.

**61.** *Id.* at 363. This statement, however, is somewhat misleading in that the "B" options would not have come into being unless the employment were extended beyond the origi-

nal five years. It is correct, however, that this non-fault termination cut off the possibility of Ovitz receiving those options and that those options had been a potentially valuable incentive for Ovitz to remain in Disney's employ, an incentive that Ovitz relinquished.

**62.** *See id.* at 350.

**63.** *Vogelstein,* 699 A.2d at 336 (emphasis in original) (citations omitted); *accord Grimes,* 673 A.2d at 1214.

find no error in the decision of the Court of Chancery on the waste test.

■■■ As for the plaintiffs' contention that the directors failed to exercise "substantive due care," we should note that such a concept is foreign to the business judgment rule. Courts do not measure, weigh or quantify directors' judgments. We do not even decide if they are reasonable in this context.[64] Due care in the decisionmaking context is *process* due care only. Irrationality [65] is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule.[66]

### *Plaintiffs' Contention that the New Board Committed Waste in Its Decision That Ovitz' Contract Should be Terminated on a "Non–Fault" Basis*

■■ The plaintiffs contend in this Court that Ovitz resigned or committed acts of gross negligence or malfeasance that constituted grounds to terminate him for cause. In either event, they argue that the Company had no obligation to Ovitz and that the directors wasted the Company's assets by causing it to make an unnecessary and enormous payout of cash and stock options when it permitted Ovitz to terminate his employment on a "non-fault" basis. We have concluded, however, that the Complaint currently before us does not set forth particularized facts that he re-

signed or unarguably breached his Employment Agreement.

The Complaint does not allege facts that would show that Ovitz had, in fact, resigned before the Board acted on his non-fault termination. Plaintiffs contend, in effect, that the sum total of Ovitz' actions constituted a *de facto* resignation. But the Complaint does not allege that Ovitz had *actually* resigned. It alleges merely that he: (a) was dissatisfied with his role; (b) was underperforming; (c) was seeking and entertaining other job offers; and (d) had written to Eisner on September 5, 1996, "express[ing] his desire to quit." These are not particularized allegations that he resigned, either actually or constructively.

Additionally, the Complaint is internally inconsistent with plaintiffs' argument that Ovitz had resigned. The Complaint alleges that Ovitz would not actually resign before he could achieve a lucrative payout under the generous terms of his 1995 Employment Agreement. The clear inference from the Complaint is that he would lose all leverage by resigning. For example, the Complaint paraphrases Robert Slater's recent biography of Ovitz as stating that "the only reason Ovitz did not simply state outright that he quit his position at Disney was his realization that doing so would deprive him of all severance benefits" of his Employment Agreement. The Court of Chancery correctly concluded:

> As for Plaintiffs' contention that Ovitz actually or impliedly tendered his resignation before the Board approved the Non–Fault Termination, I do not believe

---

**64.** *Cf. Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1377 (1996) (noting the inapplicability of a reasonableness analysis in a case that "does not involve either unilateral director action in the face of a claimed threat or an act of disenfranchisement").

**65.** Directors' business "decisions will not be disturbed if they can be attributed to any rational business purpose." *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971).

**66.** The business judgment rule has been well formulated by *Aronson* and other cases. *See,*

*e.g., Aronson,* 473 A.2d at 812 ("It is a presumption that in making a business decision the directors ... acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation."). Thus, directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.

this conclusion can reasonably be drawn from the facts alleged by Plaintiffs. While I would agree that Ovitz's September 5 letter to Eisner and his search for another job provide strong evidence of Ovitz's lack of commitment to the Company, they are not legally tantamount to a voluntary resignation.[67]

■■■ The Complaint alleges that it was waste for the Board to pay Ovitz essentially the full amount he was due on the non-fault termination basis because he should have been fired for cause. Ovitz' contract provided that he could be fired for cause only if he was grossly negligent or committed acts of malfeasance. Plaintiffs contend that ample grounds existed to fire Ovitz for cause under these terms. The Court of Chancery correctly concluded:

> The terms of the Employment Agreement limit "good cause" for terminating Ovitz's employment to gross negligence or malfeasance, or a voluntary resignation without the consent of the Company. I have reviewed the amended complaint and listened to the parties' arguments at the hearing in connection with Defendants' motion to dismiss. Still, I am unable to conclude that any of the facts alleged by Plaintiffs, even accepted as true, demonstrate that Ovitz's conduct was either grossly negligent or malfeasant during his tenure at Disney, or that Ovitz resigned voluntarily. For example, Plaintiffs allege that Ovitz sought alternative employment while he was the president of Disney. But Plaintiffs fail to explain how looking for another job constitutes gross negligence or malfeasance. The same holds true for Plaintiffs' allegation that Ovitz failed to follow Eisner's directive to meet with Director Defendant Stephen F. Bollenbach, who was then the senior executive vice president and chief financial officer of Disney. This allegation may demonstrate that Ovitz failed to become familiar with

Disney's finances or that he bucked authority at Disney. However, it does not demonstrate, without more, that Ovitz was grossly negligent or committed malfeasance. None of Plaintiffs' allegations rise to the level of gross negligence or malfeasance.[68]

Construed most favorably to plaintiffs, the facts in the Complaint (disregarding conclusory allegations) show that Ovitz' performance as president was disappointing at best, that Eisner admitted it had been a mistake to hire him, that Ovitz lacked commitment to the Company, that he performed services for his old company, and that he negotiated for other jobs (some very lucrative) while being required under the contract to devote his full time and energy to Disney.

All this shows is that the Board had *arguable* grounds to fire Ovitz for cause. But what is alleged is only an *argument* — perhaps a good one—that Ovitz' conduct constituted gross negligence or malfeasance. First, given the facts as alleged, Disney would have had to persuade a trier of fact and law of this argument in any litigated dispute with Ovitz. Second, that process of persuasion could involve expensive litigation, distraction of executive time and company resources, lost opportunity costs, more bad publicity and an outcome that was uncertain at best and, at worst, could have resulted in damages against the Company.

The Complaint, in sum, contends that the Board committed waste by agreeing to the very lucrative payout to Ovitz under the non-fault termination provision because it had no obligation to him, thus taking the Board's decision outside the protection of the business judgment rule. Construed most favorably to plaintiffs, the Complaint contends that, by reason of the New Board's available arguments of resignation and good cause, it had the leverage

---

**67.** *In re The Walt Disney Co. Derivative Litig.,* 731 A.2d at 364.

**68.** *Id.* at 363–64.

to negotiate Ovitz down to a more reasonable payout than that guaranteed by his Employment Agreement. But the Complaint fails on its face to meet the waste test because it does not allege with particularity facts tending to show that no reasonable business person would have made the decision that the New Board made under these circumstances.

■ We agree with the conclusion of the Court of Chancery:

The Board made a business decision to grant Ovitz a Non–Fault Termination. Plaintiffs may disagree with the Board's judgment as to how this matter should have been handled. But where, as here, there is no reasonable doubt as to the disinterest of or absence of fraud by the Board, mere disagreement cannot serve as grounds for imposing liability based on alleged breaches of fiduciary duty and waste. There is no allegation that the Board did not consider the pertinent issues surrounding Ovitz's termination. Plaintiffs' sole argument appears to be that they do not agree with the course of action taken by the Board regarding Ovitz's separation from Disney. This will not suffice to create a reasonable doubt that the Board's decision to grant Ovitz a Non–Fault Termination was the product of an exercise of business judgment. As demand is not excused as to Plaintiffs' claims in connection with the current Board's decision to grant Ovitz's Non–Fault Termination, these claims must be dismissed.[69]

To rule otherwise would invite courts to become super-directors, measuring matters of degree in business decisionmaking and executive compensation. Such a rule would run counter to the foundation of our jurisprudence.

Nevertheless, plaintiffs will have another opportunity—if they are able to do so consistent with Chancery Rule 11[70]—to file a short and plain statement[71] alleging particularized facts creating a reasonable doubt that the New Board's decision regarding the Ovitz non-fault termination was protected by the business judgment rule.

### No Discovery Permitted; Books and Records May be Available

Plaintiffs complain, in effect, that the system of requiring a stockholder to plead particularized facts in a derivative suit is basically unfair because the Court will not permit discovery under Chancery Rules 26–37 to marshal the facts necessary to establish that pre-suit demand is excused.[72] This is a common complaint, one that is echoed in the *amicus* brief of the Council of Institutional Investors on this appeal. But this argument has been answered by this Court on several occasions.

Plaintiffs may well have the "tools at hand" to develop the necessary facts for pleading purposes.[73] For example, plaintiffs may seek relevant books and records of the corporation under Section 220 of the Delaware General Corporation Law,[74] if they can ultimately bear the burden of showing a proper purpose and make specific and discrete identification, with rifled precision, of the documents sought. Fur-

---

**69.** *In re The Walt Disney Co. Derivative Litig.,* 731 A.2d at 364 (footnote omitted).

**70.** Rule 11(b) provides, in part, that subject to sanctions for violating the rule, an attorney "[b]y presenting to the Court ... a [signed] pleading ... is certifying that to the best of the [attorney's] knowledge, information and belief, formed after an inquiry reasonable under the circumstances ... the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a rea-

sonable opportunity for further investigation or discovery."

**71.** *See* Ct.Ch.R. 8(a).

**72.** *See Levine,* 591 A.2d at 208–210.

**73.** *See Grimes,* 673 A.2d at 1216 n. 11, 1218; *Scattered Corp. .,* 701 A.2d at 78; *Rales v. Blasband,* Del.Supr., 634 A.2d 927, 935 n. 10 (1993).

**74.** 8 *Del.C.* § 220; *see* note 57 *supra.*

ther, they must establish that each category of books and records is essential to the accomplishment of their articulated purpose for the inspection.[75] We do not presume to direct the Court of Chancery how it should decide any proceeding under Section 220. From a timing perspective, however, we note that such a proceeding is a summary one that should be managed expeditiously.

### Conclusion

One can understand why Disney stockholders would be upset with such an extraordinarily lucrative compensation agreement and termination payout awarded a company president who served for only a little over a year and who underperformed to the extent alleged. That said, there is a very large—though not insurmountable—burden on stockholders who believe they should pursue the remedy of a derivative suit instead of selling their stock or seeking to reform or oust these directors from office.

Delaware has pleading rules and an extensive judicial gloss on those rules that must be met in order for a stockholder to pursue the derivative remedy. Sound policy supports these rules, as we have noted. This Complaint, which is a blunderbuss of a mostly conclusory pleading, does not meet that burden, and it was properly dismissed.

The order of the Court of Chancery dismissing the Complaint was set forth in three paragraphs.[76] Each paragraph stated that certain counts were dismissed.

That dismissal operates as an adjudication on the merits.[77] That is, the dismissal is with prejudice as to all counts. To the extent that plaintiffs have appealed the order of the Court of Chancery, we affirm that dismissal in all respects, except that paragraph 1 of the order is affirmed in part, reversed in part and remanded.

The portion of paragraph 1 that dismissed "plaintiffs claims for breach of fiduciary duty and waste, as set forth in Counts I and II of the amended complaint . . . for failure to make a demand under Court of Chancery Rule 23.1," is reversed only to the extent that the dismissal ordered by the Court of Chancery was with prejudice.[78] Because of the unusual nature of this case and the rulings in this opinion, the interests of justice require that the dismissal ordered in paragraph 1 of the Order of the Court of Chancery shall be without prejudice. Accordingly, we remand to the Court of Chancery to permit plaintiffs to file an amended complaint in accordance with the rulings of this Court as set forth in this opinion.

HARTNETT, Justice, concurring:

I agree that the complaint leaves much to be desired and that plaintiffs be given an opportunity to file an amended complaint. In my view, however, the present complaint is adequate as to some of the asserted claims, if only barely so.

Chancery Rules 23.1 and 12(b)(6) are predicated on the Federal Rules of Civil Procedure. The federal precedents therefore carry great weight.[79]

---

**75.** *See Security First Corp. v. U.S. Die Casting & Dev. Corp.,* Del.Supr., 687 A.2d 563, 567–569 (1997) (noting that "[i]t is well established that investigation of mismanagement is a proper purpose for a Section 220 books and records inspection" but that a party needs to show, by a preponderance of the evidence, that there is a legitimate chance that their reason for suspecting mismanagement is credible—a "threshold [that] may be satisfied . . . through documents, logic, testimony or otherwise"); *see also* DeMott, *supra* note 24, § 4:15, at 90.

**76.** *See In re The Walt Disney Co. Derivative Litig.,* 731 A.2d at 380.

**77.** *See* Ct.Ch.R. 41(b).

**78.** Compare *Malone v. Brincat,* Del.Supr., 722 A.2d 5, 14 (1998), where we similarly affirmed a dismissal but reversed to the extent that the dismissal was with prejudice, thus permitting plaintiff to replead.

**79.** *See Kay v. Scott,* Del.Supr., 233 A.2d 52 (1967).

Rule 23.1 does not abrogate Rule 12(b)(6), and therefore, in order for the defendants to have obtained a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6), it must have appeared "with reasonable certainty that the plaintiffs would not have been entitled to the relief sought under any set of facts which could be proven to support the action."[80] Moreover, as is true in other contexts, the plaintiffs' well-pleaded factual allegations must be taken as true and the complaint has to be read in the light most favorable to the plaintiffs.[81] The reason for Rule 23.1 is judicial economy. It is not intended to preclude a judicial inquiry where the pleaded facts, if true, and any inferences that may be drawn from them, in the light most favorable to the plaintiffs, show the likelihood of misconduct by the directors. Because of the absence of a precise formula in the Rule for pleading compliance with the demand requirement, the sufficiency of a complaint under Rule 23.1 is determined on the basis of the facts of each case.[82]

I agree that the complaint does not create a reasonable doubt as to the disinterestedness or independence of the Board. In my opinion, however, from the totality of the factual allegations in the complaint, a reasonable doubt that the business judgment rule precludes judicial inquiry already exists as to some of the other claims, such as whether the directors were aware of the total cost of Ovitz' compensation package when they approved it or whether Ovitz had actually resigned before he struck his termination deal.

Plaintiffs must not be held to a too-high standard of pleading because they face an almost impossible burden when they must plead facts with particularity and the facts are not public knowledge. Brushing aside technicalities, the issue here is whether this suit should have been dismissed by the Court of Chancery at this stage of the litigation without any discovery or whether the allegations in the complaint were sufficient to justify at least some discovery. In my opinion, the complaint already sufficiently alleges facts to warrant some limited discovery as to some of the claims.

---

**80.** *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1104 (1985).

**81.** *See* 7C Charles Alan Wright et al., *Federal Practice and Procedure: Federal Rules of Civil Procedure Rules 23.1 to 25* § 1836 (2d ed.1986) (citing *Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.*, D.C.Cir., 173 F.2d 416 (1949); *Overfield v. Pennroad Corp.*, 3d Cir., 113 F.2d 6 (1940); *Citrin v. Greater New York Indus., Inc.*, S.D.N.Y., 79 F.Supp. 692 (1948); and *Issner v. Aldrich*, D.Del., 254 F.Supp. 696 (1966)).

