# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JENNA HARPER, derivatively on behalf of T-Mobile US, INC., <br><br> Plaintiff, <br><br> v. <br><br> G. MICHAEL SIEVERT, TIMOTHEUS HÖTTGES, MARCELO CLAURE, SRIKANT M. DATAR, SRINIVASAN GOPALAN, CHRISTIAN P. ILLEK, RAPHAEL KÜBLER, LETITIA A. LONG, THORSTEN LANGHEIM, DOMINIQUE LEROY, TERESA A. TAYLOR, KELVIN R. WESTBROOK, BAVAN HOLLOWAY, MICHAEL WILKENS, OMAR TAZI, LAWRENCE H. GUFFEY, and RONALD D. FISHER, <br><br> Defendants, <br><br> -and- <br><br> T-MOBILE US, INC., <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) C.A. No. 2022-0819-SG ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  February 1, 2024
Date Decided:  May 31, 2024

Joseph L. Christensen, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; OF COUNSEL: Brian J. Dunne and Edward M. Grauman,

BATHAEE DUNNE LLP, Austin, Texas; Yavar Bathaee and Andrew C. Wolinsky, BATHAEE DUNNE LLP, New York, New York, *Attorneys for Plaintiff*.

A. Thompson Bayliss, Peter C. Cirka, and E. Wade Houston, ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: Roger A. Cooper and Mark E. McDonald, CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, *Attorneys for Defendants*.

**GLASSCOCK, Vice Chancellor**

This matter is an action brought by a stockholder of a Delaware corporation, T-Mobile US, Inc. ("T-Mobile"). Plaintiff brings her claims derivatively, seeking to hold current and former directors liable for a business decision of T-Mobile: aggregating its user data in a way that was vulnerable to hacking. In fact, T-Mobile was hacked, leading to corporate trauma.

Per the Complaint, T-Mobile is controlled by a German company, non-party Deutsche Telekom AG ("DTK"). That entity caused its European subsidiaries to aggregate their data so that DTK could mine it in a variety of ways profitable to DTK. This aggregation program was called "sharing is caring."[1] Plaintiff alleges that T-Mobile imposed a "sharing is caring" regime on its data in the United States, leading, as described above, to corporate trauma. This would seem to be a quintessential business decision on behalf of T-Mobile. Instead, the Complaint proposes that DTK wanted to share the T-Mobile data, and to that end coerced the T-Mobile board to enter a dangerous aggregation scheme, risk be damned, and without benefit to T-Mobile itself. Thus, the corporate trauma was the "result of a conscious design decision by T-Mobile at the direction of its captured board and management, one foisted upon it by its DTK overlords."[2]

---

[1] A moniker so saccharine as to arouse instant suspicion.
[2] Am. Verified S'holder Deriv. Compl. ¶ 10, Dkt No. 32 ("Am. Compl."). Per Plaintiff, and to paraphrase Kent Brockman: T-Mobile, for one, welcomed its DTK overlords.

1

Therefore, Plaintiff posits that the corporate trauma was the result of a risky decision by a majority of T-Mobile directors who lacked independence from DTK, and taken solely for purposes of DTK, for which decision non-party DTK and these Defendant Directors are liable; Plaintiff thereby stating both a claim of equitable tort *and* excusing demand.

The matter is before me on a motion to dismiss. The Complaint adequately alleges that the majority of T-Mobile directors lack independence from the corporate controller, DTK. Plaintiff also asserts that DTK "forced" T-Mobile to "implement its unilateral business interests,"[3] benefiting DTK at the expense of foreseeable corporate trauma to T-Mobile. But these are mere assertions not supported by non-conclusory averments of fact. There is no specific allegation supporting that 1) DTK instructed T-Mobile to aggregate its data, let alone in a risky way, 2) T-Mobile's board considered data consolidation, in disregard of its risks to the company, let alone at DTK's direction, or 3) DTK made any use of T-Mobile's consolidated data, let alone use that constitutes a non-ratable benefit seized by DTK.[4]

Because I find that demand is not excused under the facts alleged, the matter is dismissed under Court of Chancery Rule 23.1. My rationale follows.

---

[3] Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss 37, Dkt. No. 35 ("Pl.'s Opp'n").

[4] The comic Bob Newhart had a routine where he played a skeptical TV host interviewing a man who owned "the world's smallest horse." He asked the owner for proof: "How do you know he's the world's smallest horse?" Well, the owner replied, "Just look at him!" This bald, and bold, assertion in comedy led to laughter; here, to dismissal.

# I. BACKGROUND[5]

*A. Factual Background*

### 1. The Parties

Plaintiff Jenna Harper is a stockholder of T-Mobile.[6]  Ms. Harper asserts that she has been a continuous stockholder at all times relevant to the claims contained in this action.[7]

Defendants G. Michael Sievert,[8] Timotheus Höttges, Marcelo Claure, Srikant M. Datar, Christian P. Illek, Srinivasan Gopalan, Raphael Kübler, Letitia A. Long, Thorsten Langheim, Dominique Leroy, Teresa A. Taylor, Kelvin R. Westbrook, and Bavan Holloway are directors of T-Mobile US, Inc. (collectively, the "Director Defendants").[9]

Defendants Michael Wilkens, Lawrence H. Guffey, Ronald D. Fisher, and Omar Tazi are former directors of T-Mobile US, Inc. (collectively, the "Former Director Defendants" and, together with the Director Defendants, the "Individual Defendants").[10]

---

[5] This Memorandum Opinion includes only those facts necessary to my analysis.
[6] Am. Compl. ¶ 17.
[7] *Id.*
[8] The Complaint also asserts claims against Sievert in his capacity as a T-Mobile officer regarding his position as the Company's CEO since 2020 and former positions as its President and COO since 2018.  *Id.* ¶ 39.
[9] *Id.* ¶¶ 21–34.
[10] *Id.* ¶¶ 35–38.

Nominal Defendant T-Mobile US, Inc. ("T-Mobile" or the "Company") is a Delaware corporation headquartered in Bellevue, Washington.[11] T-Mobile is a wireless communications services company that provides wireless voice and data services to approximately 100 million customers nationwide.[12]

Non-party Deutsche Telekom AG ("DTK") is T-Mobile's largest stockholder.[13]

### 2. The "Sharing is Caring" Initiative is Allegedly Developed in DTK's Europe Subsidiaries

The Amended Verified Shareholder Derivative Complaint (the "Complaint") describes a time period in which a team within DTK's Telekom Innovation Laboratories subgroup was directed to analyze ways that DTK could potentially benefit from user data through the adoption of Data Driven Business Models.[14] After its analysis, the team discovered that there was a demand for data-driven solutions across each department at DTK.[15] The Complaint alleges DTK encountered two hurdles to implementing these data-driven solutions. First, at the time, DTK's data systems were segregated by each subsidiary in Europe (the "NatCos"), set up to not be commingled or jointly mined.[16] Second, the proposal for the use of DTK's

---

[11] *Id.* ¶ 18.
[12] *Id.* ¶ 19.
[13] *Id.* ¶ 1.
[14] *Id.* ¶ 62.
[15] *Id.* ¶ 66.
[16] *Id.* ¶ 68.

4

customer data brought forth privacy concerns considering Germany's uniquely restrictive privacy laws.[17] Although these hurdles existed, the team continued to work to provide data-driven solutions to DTK's executives and board, through a subsidiary wholly owned by DTK.[18]

According to the Complaint, to overcome the hurdle for privacy concerns, DTK considered accessing and processing data in the United States where data privacy regulations were more lax.[19] The Complaint states that DTK presented these differences in "Processing of Personal Data in Principle Permitted" within the United States and Europe during a presentation to DTK employees at a 2016 conference.[20] The Complaint further alleges that at a 2018 DTK supervisory board meeting presentation, DTK discussed its reliance on the U.S. market for its revenue and its "[m]ore friendly regulatory environment" for revenue generation.[21] As stated by the Complaint, DTK embraced conglomeration of data from its subsidiaries and began pursuing centralization of data sources across the entire Deutsche Telekom Group to overcome the hurdle of accessing data from across businesses.[22]

During 2017 and 2018, the Complaint alleges, DTK changed into a data and artificial intelligence-driven company, in which its data solutions team created tools,

---

[17] *Id.* ¶¶ 69, 70–71.
[18] *Id.* ¶ 71.
[19] *Id.* ¶ 73.
[20] *Id.* ¶ 75.
[21] *Id.* ¶ 74.
[22] *Id.* ¶¶ 79–82.

strategies, and frameworks to share information across DTK's European subsidiaries and affiliates.[23] According to the Complaint, each NatCo within DTK was expected to have a pooled and centralized repository of data available to it and then commingle and dispense information learned from that data for the benefit of DTK as a whole.[24] The resulting data analyses would then be used to benefit DTK as a whole to improve its profitability and to increase its savings.[25]

In addition, as specified by the Complaint, each NatCo and subsidiary was directed to model its data model and align its machine learning and artificial intelligence activities with those of the parent company, which were developed by Dr. Susan Wegner, a former DTK employee, and her team.[26] The Complaint refers to this model as the "sharing is caring" initiative.[27] The Complaint alleges that, in addition to requiring each entity to have a pooled and centralized repository of data, DTK also set up "an internal DTK-wide data platform," which automatically in a centralized way controlled permission, linked to local sources, and processed requests virtually.[28]

---

[23] *Id.* ¶ 82.
[24] *Id.* ¶ 85.
[25] *Id.* ¶¶ 85, 89–90, 95, 98.
[26] *Id.*
[27] *Id.* ¶ 87.
[28] *Id.* ¶¶ 92, 94.

### 3. The "Sharing Is Caring" Initiative is Allegedly Implemented at T-Mobile in the United States

In 2018, T-Mobile announced a merger with Sprint, which, according to the Complaint, created a bigger pool of customer data.[29] That same year, the Complaint asserts that DTK incorporated the "sharing is caring" data strategy within T-Mobile.[30] The Complaint alleges that T-Mobile hired a small team to facilitate the execution of the program and gave the team unrestricted access to all of T-Mobile's data and systems with a consolidated credential and data repository system.[31]

According to the Complaint, afterwards, T-Mobile created a new data-driven/AI infrastructure to streamline accessibility to data across its organization, which, per Plaintiff, was "beat-for-beat" similar to the framework developed by DTK's team in Europe.[32] To facilitate centralized data access across the Company, the Complaint states T-Mobile created a system called qAPI, which allowed quick access to data throughout T-Mobile in a centralized fashion using a standardized API.[33] Overall, the Complaint alleges that T-Mobile implemented a program that was modeled after DTK's data program, which in turn ultimately benefited DTK.

---

[29] *Id.* ¶¶ 110–14.
[30] *Id.* ¶ 114.
[31] *Id.* ¶ 119.
[32] *Id.* ¶¶ 118, 130.
[33] *Id.* ¶ 172. qAPI "is a micro-service that converts an API call to a database query" and API is application programming interface. *Id.* ¶ 185.

### 4. T-Mobile Suffers Repeated Cyberattacks After Allegedly Implementing the "Sharing is Caring" Initiative

The Complaint alleges that the centralization of data and access credentials to facilitate single point access put T-Mobile at a heightened risk for cyberattacks.[34] After the implementation of the "sharing is caring" data strategy within T-Mobile, the Company suffered numerous data breaches.[35] In August 2021, T-Mobile experienced such a data breach, where a hacker discovered "an unprotected [T-Mobile] router exposed on the internet."[36] The hacker used that access point to gain access to "more than 100 servers."[37] In response, the Complaint alleges T-Mobile's CEO, Michael Sievert, issued a statement attributing the breach to a specialized knowledge-based attack.[38]

To remedy the effects of cyberattacks, the Complaint asserts that T-Mobile agreed to a $500 million settlement for class action suits arising from the August 2021 breach.[39] According to the Complaint, after the breach, T-Mobile's directors did not meaningfully address nor agree to end its use of centralized credential repositories.[40] The Complaint alleges that these individuals are beholden to DTK

---

[34] Id. ¶¶ 142, 191.
[35] *Id.* ¶¶ 199–294.
[36] *Id.* ¶ 254.
[37] *Id.* ¶ 255.
[38] *Id.* ¶ 277.
[39] *Id.* ¶¶ 295–98.
[40] *Id.* ¶ 283. The fourteen members of T-Mobile's Board at the time this lawsuit was filed in September 2022 were: Marcelo Claure, Srikant M. Datar, Srinivasan Gopalan, Bavan Holloway,

8

and sought to carry out DTK's bidding to the detriment of the Company and its stockholders.[41] The Complaint states the "sharing is caring" plan is currently still in place under the purview of T-Mobile's directors and that T-Mobile's users are still at risk.[42]

In essence, the Complaint alleges that DTK, the majority stockholder, desired consumer data to be aggregated, and in spite of the risks such implementation posed to the Company and its stockholders, the company (presumably, via the Individual Defendants) implemented the "sharing is caring" plan, from which DTK extracted a non-ratable benefit.

*B. Procedural History*

Plaintiff filed her initial complaint on September 16, 2022,[43] and later filed the operative Complaint on April 5, 2023.[44] The Complaint asserts breach of fiduciary duty claims against the Director Defendants, the Former Defendants, and against Sievert as an Executive Officer.[45] Thereafter, on June 13, 2023, Defendants filed their Motion to Dismiss the Complaint[46] and an Opening Brief in Support

---

Timotheus Höttges, Christian P. Illek, Raphael Kübler, Thorsten Langheim, Dominique Leroy, Letitia A. Long, G. Michael Sievert, Teresa A. Taylor, Omar Tazi, and Kelvin R. Westbrook (collectively, the "Demand Board"). *Id.* ¶¶ 21, 36.

[41] *Id.* ¶ 313.

[42] *Id.* ¶¶ 313, 322.

[43] Verified Shareholder Derivative Compl., Dkt. No. 1.

[44] Am. Compl.

[45] *Id.* ¶¶ 373–400.

[46] Defs.' Mot. to Dismiss the Am. Verified S'holder Deriv. Compl., Dkt. No. 34.

of their Motion to Dismiss.[47] Plaintiff filed her Opposition to Defendants' Motion to Dismiss on August 15, 2023,[48] and Defendants filed its Reply Brief on October 13, 2023.[49] I heard oral argument on Defendants' Motion to Dismiss on February 1, 2024, and took the matter under advisement that day.[50]

## II. ANALYSIS

When seeking to bring a derivative action on behalf of a corporation, a stockholder must either (i) seek to have the corporation bring the action itself by making a demand on the board– and if the board refuses, show that such refusal was wrongful– or (ii) demonstrate with particularity that such an effort would be futile.[51] If not, the derivative action will be dismissed.[52] Court of Chancery Rule 23.1 provides the applicable standard of review to assess demand futility and requires that the plaintiff must "allege with particularity" within her complaint "the reasons for not . . . making the effort."[53]

Derivative actions are obviously value-enhancing when strictly necessary; in those cases where the directors cannot monetize a litigation asset, value for the entity

---

[47] Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Am. Verified S'holder Deriv. Compl., Dkt. No. 34 ("Defs.' OB").
[48] *See* Pl.'s Opp'n.
[49] Def.s' Reply Br. in Supp. of Their Mot. to Dismiss the Am. Compl., Dkt. No. 37 ("Defs.' RB").
[50] Oral Arg. before Vice Chancellor Sam Glasscock dated 2.1.24, Dkt. No. 40.
[51] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021).
[52] *Id.* at 1058.
[53] Ct. Ch. R. 23.1(a).

is created by letting a stockholder fill the breach. They do, however, violate the core idea of our corporate law, that directors—not stockholders—control the company. Thus, Rule 23.1 strikes a balance between these two interests. A stockholder wishing the entity to vindicate a litigation asset must demand that the board do so, thus conceding that the board is able to apply its business judgement on behalf of the entity in consideration of the demand. Or, if the stockholder determines that such a demand would be futile, she must demonstrate that fact in her complaint, before she may attempt to vindicate the asset.[54] The standard of review to assess demand futility is more stringent, thus, than that applicable to a motion to dismiss pursuant to Rule 12(b)(6). To justify circumvention of board's default role, Rule 23.1 requires derivative complaints to allege demand futility with particularity, "which differ[s] substantially from notice pleading."[55]

This Court assesses demand futility on a director-by-director basis by considering the following:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

---

[54] *See, e.g., United Food & Comm. Workers Union v. Zuckerberg*, 250 A.3d 862, 875–77 (Del. Ch. 2020), aff'd, 262 A.3d 1034.

[55] *Zuckerberg*, 262 A.3d at 1048 (internal quotations omitted) (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)).

(ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[56]

Demand is excused "[i]f the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile.[57]

Although a plaintiff must plead facts with particularity, she is still entitled to the benefit of all reasonable inferences and the Court must accept as true all particularized and well-pled allegations contained in the complaint.[58] The reasonable inferences "must logically flow from particularized facts alleged by the plaintiff."[59]

Plaintiff did not make a pre-suit demand before filing this action,[60] and, in the Complaint, asserts that demand is futile based on the allegations that the majority of the Demand Board lacks independence from the controller, DTK, which Plaintiff alleges received a material benefit or faces a substantial likelihood of liability.[61]

---

[56] *Id.* at 1058.
[57] *Id.* at 1059.
[58] *Id.* at 1048.
[59] *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).
[60] Am. Compl. ¶ 350.
[61] *Id.* ¶¶ 351–72. Plaintiff has not argued in briefing or at oral argument that the Demand Defendants satisfy prong two of *Zuckerberg*.

12

Plaintiff's basis for liability against the Individual Defendants and DTK within the Complaint is a new species, at least insofar as I am aware, but appears to be a member of the genus *Caremark*.[62] That is, as I understand, the Complaint asserts that DTK wanted access to T-Mobile's customer data, a result to which a majority of the directors acquiesced, disloyally ignoring the obvious risk to T-Mobile.

The Motion to Dismiss seeks dismissal under Rule 23.1 for failure to allege with particularity that demand is in fact futile due to (i) the Individual Defendants' substantial likelihood of liability or (ii) that DTK faces a substantial likelihood of liability or received a material personal benefit from the challenged conduct.[63]

During briefing on the Motion to Dismiss, it became apparent that Plaintiff's argument for demand futility resided under prong three of the *Zuckerberg* analysis–whether the Demand Board lacks independence from DTK, which is alleged to have receive a material benefit from misconduct or faces substantial likelihood of liability.[64] At oral argument, Plaintiff conceded that its sole argument for demand futility is based on whether DTK derived a material benefit from the alleged

---

[62] The Complaint contends that these officers and directors failed to act because they were beholden to DTK and took actions to act against the interest of stockholders by: "(a) implementing a dangerous data centralization strategy, (b) failing to disclose that their loyalty is divided and that they are implementing a strategy set or expected by majority shareholder DTK, and (c) recklessly failing to put in place any safety or supervision measures to prevent further attacks." *Id.* ¶ 313.
[63] *See* Defs.' OB.
[64] Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss only briefed issues concerning prong three of the *Zuckerberg* analysis. *See* Pl.'s Opp'n; *see also Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (holding issues not briefed are deemed waived).

misconduct.[65] Defendants concede for purposes of this Motion that the Demand Board lacks independence from DTK. Thus, this Memorandum Opinion will only consider whether the Defendant Directors acted disloyally, by causing DTK to receive a non-ratable benefit from the alleged misconduct, excusing demand as futile.

> A. *Plaintiff Fails to Establish Allegations with Particularity that DTK Received a Material Benefit or Had an Interest in the Alleged Misconduct, so as to Excuse Demand*

Plaintiff asserts that a majority of the Demand Board is beholden to DTK, and therefore lacks independence to adequately assess a demand.[66] Plaintiff also asserts that DTK received a material benefit through its misconduct of directing T-Mobile to centralize and aggregate its data to gain entry to T-Mobile's customer data to advance DTK's machine learning models, thus providing cost savings to DTK.[67] Plaintiff contends that DTK received these benefits while T-Mobile suffered $500 million in liabilities arising from its accommodation of DTK's misconduct.[68] In essence, Plaintiff contends that DTK is monetizing T-Mobile's customer data to the detriment of the Company. Defendants do not dispute that a majority of the Demand Board lacks independence from DTK, the corporate controller.[69] Rather, Defendants

---

[65] Tr. of 2-1-2024 Oral Arg. on Defs.' Mot. to Dismiss 32:22–33:6, 68:16–69:21, Dkt. No. 41 ("Oral Arg. Tr.").
[66] Pl.'s Opp'n 24–28; Am. Compl. ¶¶ 354–72.
[67] Pl.'s Opp'n 33–36; Am. Compl. ¶ 355; Oral Arg. Tr. 43:20–24.
[68] Pl.'s Opp'n 35; Am. Compl. ¶ 295.
[69] Defs.' OB 28.

14

assert that Plaintiff has failed to allege with particularity that DTK derived a material benefit from the alleged misconduct.[70]

Assuming for purposes of this Motion that the Individual Defendants are in fact beholden to DTK, Plaintiff must allege facts with particularity that DTK held a material interest in the misconduct or received a material benefit in the wrongdoing.[71]  In *Chester County Employees' Retirement Fund*,[72] a plaintiff asserted direct and derivative claims against members of the company's board of directors, other related individuals in their respective capacities, and the company's corporate controller, for overpayment for assets.[73]  The plaintiff did not make demand on the company's board before bringing its claims and asserted demand was futile.[74]

In assessing demand futility, the Court held that the plaintiff alleged particularized facts to sufficiently call into question the director defendants' disinterestedness in the transaction, as they held dual fiduciary positions within the company and the controller company.[75]  The Court, however, held that the plaintiff did not plead particularized facts to imply that the controller had a material interest in the challenged transactions "to show that the board had a disabling conflict that

---

[70] *Id.* at 28–34.
[71] *See Zuckerberg*, 262 A.3d 1034 at 1059; *see also Chester Cty. Empls.' Ret. Fund v. New Residential Inv. Corp.*, 2016 WL 5865004, at *10 (Del. Ch. Oct. 7, 2016), *aff'd*, 186 A.3d 798 (Del. 2018).
[72] 2016 WL 5865004, at *1.
[73] *Id.* at *1.
[74] *Id.* at *8.
[75] *Id.* at *10.

excise[d] demand . . . ”[76] and held that “[a]llegations that some . . . effects of the challenged transactions benefited [the controller company] alone [were] not enough.[77] The Court also held that the plaintiff failed to adequately allege an incentive on behalf of the director defendants' for overpayment.[78] Thus, the Court found the plaintiff did not allege sufficient facts to excuse demand.[79]

Here, I find that Plaintiff's allegations concerning a material benefit are insufficient to satisfy a particularized pleading requirement under Rule 23.1. The Complaint is replete with conclusory allegations that DTK “directed” T-Mobile to implement the “sharing is caring” plan, however the Complaint fails to state with particularity (i) what actions DTK undertook to execute the implementation, or even how its wishes were transmitted to the directors, and (ii) how DTK benefited from such execution.

The Complaint fails to identify a specific transaction the board undertook or a board action that adopted data centralization within T-Mobile. Notably, Plaintiff did not undertake a Section 220 demand to determine whether the board assessed implementing the “sharing is caring plan.”[80] Rather, Plaintiff in her Complaint utilizes information from public sources to support her allegations and contends that

[76] *Id.* at *11.
[77] *Id.*
[78] *Id.* at *12.
[79] *Id.*
[80] Oral Arg. Tr. 45:1–46:17.

16

T-Mobile, as a subsidiary, like the European NatCos, was subjected to DTK's global policy. Particularly, Plaintiff relies on YouTube videos of two public presentations given by Dr. Wegner, a PowerPoint slide from a 2018 DTK supervisory board meeting, and the public announcement of T-Mobile's merger with Sprint, to provide an inference that DTK mandated implementation of the "sharing is caring" program in T-Mobile in the United States.[81]

The public presentations utilized by Plaintiff do not suggest that DTK directed T-Mobile to centralize data nor mention that DTK participated in mining T-Mobile's data.[82] For instance, the 2016 presentation slide that Plaintiff asserts leads to an inference that DTK mandated data centralization in T-Mobile, but the slide in actuality merely highlights the differences between regulations in Europe and the United States.[83] Further, the slide presented at the 2018 DTK supervisory board meeting simply states that the "US market [is] more attractive."[84] In addition, Dr. Wegner's July 2018 presentation solely states that DTK could save money by centralizing data.[85] In sum, these presentations in combination show DTK's intent to centralize data, but fail to provide a particularized allegation that DTK directed T-Mobile to centralize its data, allowing DTK to monetize T-Mobile's data, and

---

[81] Pl.'s Opp'n 29–33.
[82] *See* Compl. ¶¶ 63, 73–74, 76, 83, 87, 90, 92, 94.
[83] *See id.* ¶ 73.
[84] *See id.* ¶ 74.
[85] *See id.* ¶¶ 83, 87, 89, 90.

directing the board to disregard the (allegedly) manifest risk. Significantly, neither of these slides make reference to T-Mobile.

In addition, the public announcement of the merger between Sprint and T-Mobile, by itself without supporting facts, cannot support an inference that DTK initiated the merger to further its end goals. At oral argument, Plaintiff asserted that since the CEO of DTK sits on the T-Mobile board, it is implausible to infer that DTK was not involved with the implementation of the "sharing is caring" plan within T-Mobile.[86] I do not find such inference sufficient to satisfy the particularized requirement under Rule 23.1 because Plaintiff has failed to state what specific actions this director *or any other director* took to implement the plan. Presumably, this is because no documents or evidence supporting Plaintiff's theory exist, or because they are unavailable to Plaintiff due to the absence of a Section 220 demand.

Overall, Plaintiff has not demonstrated that DTK in fact accessed or received T-Mobile's customer data, resulting in a material benefit to DTK that would subject the Demand Board to a disabling conflict. Nor has it identified a specific transaction or board decision to which such a conflict might apply. The record is lacking allegations on how the alleged benefit, i.e., the savings and monetization, was accessed by DTK. There are no specific pleadings showing that DTK instructed the directors to implement data integration, or that the directors ever assessed the issue.

---

[86] Oral Arg. Tr. 34:12–19.

Through the record that Plaintiff has established, Plaintiff has merely shown that both DTK and T-Mobile centralized data to make it easier to access. From the facts, I cannot infer that DTK directed T-Mobile to structure implement data centralization to T-Mobile's detriment, nor that DTK received a material benefit from such implementation. Further, the Plaintiff has not addressed why DTK, as a majority owner, would undertake actions to put the Company at risk, such as promoting lax data security, thus jeopardizing its majority interest in the Company. Plaintiff has failed to adequately plead that DTK received a material benefit from the misconduct, thus I find her demand was not excused.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Amended Verified Shareholder Derivative Complaint is GRANTED. The parties should submit a form of order consistent with this Memorandum Opinion.

19