# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VLADIMIR GUSINSKY REVOCABLE TRUST, Derivatively on behalf of Nominal Defendant RTX CORPORATION, | § § § § § | No. 347, 2024 |
| | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| Plaintiff Below, Appellant, | § § | C.A. No. 2022-1124 |
| | § | |
| v. | § | |
| | § | |
| GREGORY J. HAYES, TRACY A. ATKINSON, LLOYD J. AUSTIN III, MARSHALL O. LARSEN, THOMAS A. KENNEDY, GEORGE R. OLIVER, ROBERT (KELLY) ORTBERG, MARGARET L. O'SULLIVAN, DINESH C. PALIWAL, ELLEN M. PAWLIKOWSKI, DENISE L. RAMOS, FREDERIC G. REYNOLDS, BRIAN C. ROGERS, JAMES A. WINNEFELD, JR., and ROBERT O. WORK, | § § § § § § § § § § § § § § § § § | |
| Defendants Below, Appellees, | § § | |
| and | § § | |
| RTX CORPORATION, | § § | |
| Nominal Defendant Below, Appellee. | § § | |

Submitted: March 26, 2025
Decided: May 28, 2025

Before **SEITZ**, Chief Justice; **VALIHURA** and **GRIFFITHS**, Justices.

## ORDER

After consideration of the parties' briefs, the record on appeal, and following oral argument, it appears to the Court that:

(1) In 2018, United Technologies Corporation ("UTC") determined that it would spin off two of its operating subsidiaries, Otis Worldwide Corporation ("Otis") and Carrier Global Corporation ("Carrier"), into independent companies.[1] In 2019, UTC announced a merger of its remaining aerospace businesses with Raytheon Company, forming Raytheon Technologies Corporation, or "RTX."

(2) In preparation for the spinoff and merger, UTC's compensation committee addressed how it would convert existing UTC employee equity awards into awards for the three post-transaction companies. The committee used a formula to adjust the number of awards and exercise prices by comparing UTC's pre-transaction stock price to the post-transaction stock prices of Carrier, Otis, and RTX. The new prices would be measured using a volume-weighted average price ("VWAP") over the fourth and fifth trading days after the transactions closed. Under UTC's two Long Term Equity Incentive Plans ("LTIPs"), certain equity award

---

[1] We take the facts from the underlying decision. *Vladimir Gusinsky Revocable Tr. v. Hayes*, 2024 WL 3508530, at *2 (Del. Ch. July 23, 2024) [hereinafter *Letter Opinion*].

modifications required UTC stockholder approval, but not in the case of a spinoff.[2] The formula was memorialized in an Employee Matters Agreement ("EMA").

(3) The transactions closed on April 3, 2020. In the weeks leading up to the closing, UTC's stock price decreased about 43%.[3] However, in the days immediately following the transactions, the prices of RTX, Carrier and Otis rose significantly.[4] By using a VWAP on the fourth and fifth trading days post-closing, the aggregate stock prices of the new companies were significantly higher than UTC's pre-closing price, thereby decreasing the number of post-closing awards and increasing the exercise price of those awards.[5] In response to this unanticipated price volatility, RTX's board consulted outside advisors—PricewaterhouseCoopers LLP, Goldman Sachs, and Wachtell, Lipton, Rosen & Katz—and considered adjusting the conversion formula.

(4) The RTX board considered the advisors' recommendations and formed a three-member special committee to address potential amendments to the EMA conversion formula ("Special Committee"). The board empowered the Special

---

[2] App. to Answering Br. at B14–15 [hereinafter B__] (2014 UTC LTIP § 5(c)); B17–19 (2014 UTC LTIP § 10); B5–6 (2018 UTC LTIP § 5(c)); B4–5 (2018 UTC LTIP § 3(e))).

[3] B92 (Goldman Sachs Analysis at 1).

[4] *Id.* RTX's stock price opened at $51.00 on April 3, but by the fourth and fifth trading days, it closed at $62.62 and $64.71, respectively. *Letter Opinion* at *2.

[5] B77–78 (UTC Equity Award Conversion Board Discussion at 6–7).

Committee to evaluate and "provid[e] final approval" for an amendment in the best interests of RTX and its stockholders.[6]

(5)    After meeting three times and hearing from outside advisors and determining that the proposed EMA amendment would further RTX's interest in retaining and motivating employees, the Special Committee approved resolutions amending the EMA to replace the multi-day VWAP with a formula tied to the RTX, Carrier, and Otis opening stock prices the day the transactions closed ("Amendment").[7]

(6)    On December 6, 2022, the plaintiff, allegedly an RTX stockholder, filed a derivative action asserting claims of breaches of fiduciary duty, unjust enrichment, and waste against board members involved in the Amendment. Plaintiff also asserted that demand was excused as futile under Court of Chancery Rule 23.1. In support, Plaintiff argued that the RTX board of directors in place when the suit was filed ("Demand Board") faced a substantial likelihood of liability because it modified employee equity awards without obtaining stockholder approval as required by the LTIPs.

---

[6] B198–99 (Special Committee Resolutions at 1 and 2).

[7] B311 (Form 8-K at 2); B248–54 (Special Committee Minutes at 1–7). *See also Letter Opinion* at *4.

(7) The Court of Chancery disagreed and dismissed the complaint for failure to plead demand futility. The court held that the complaint did not contain particularized allegations raising a reasonable inference that a majority of the Demand Board faced a substantial likelihood of liability. According to the court, because RTX's certificate of incorporation exculpates Demand Board members from monetary liability for duty of care breaches, and Plaintiff's theory of recovery is based on claims that directors knowingly exceeded their authority, Plaintiff must allege bad faith conduct.[8] The complaint fell short because, according to the court, the board resolutions delegated to the Special Committee what approvals were required.[9] If the board did not make the decision, the court ruled, it could not have acted in bad faith.[10]

(8) On appeal, Plaintiff contends that the Court of Chancery erred by declining to infer that (1) the RTX board exceeded its authority when it delegated final approval of the Amendment to the Special Committee and (2) that the Demand Board knew it was violating the LTIPs' stockholder approval requirement. We review decisions of the Court of Chancery applying Rule 23.1 *de novo*.[11]

---

[8] *Letter Opinion* at *5.

[9] *Id.* at *6.

[10] *Id.* at *7.

[11] *Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000).

(9)     Because Plaintiff made no pre-suit demand, we must determine whether Plaintiff has plead with particularity that demand is excused as futile.  Demand is futile if at least half of the Demand Board either:

(i)     received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii)    faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; or

(iii)   lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[12]

(10)    Plaintiff argues first that demand is excused because the Demand Board exceeded its authority when it granted the Special Committee final approval power over the Amendment.[13]  We disagree.  The Special Committee resolutions ("Resolutions") stated that one purpose of the Special Committee was "providing final approval for the Potential Amendment."[14]  The Resolutions also state that the Special Committee may "undertake all actions that, in the determination of the

---

[12] *United Food & Com. Workers Union v. Zuckerberg*, 262 A3d 1034, 1058 (Del. 2021).

[13] Opening Br. at 27–28.

[14] B198–99 (Special Committee Resolutions at 1 and 2).

Committee, are required to fulfill the Committee Mandate."[15]   Further, the Resolutions empower the Special Committee "[t]o take such other actions, as the Committee determines necessary, appropriate or advisable in connection with any and all aspects of the Potential Amendment."[16]  Read together, the Resolutions did not prevent the Special Committee from procuring any other approval necessary for the Amendment, including stockholder approval.  Plaintiff's improper delegation argument fails.

(11)   Next, Plaintiff argues that demand was excused because at least half of the Demand Board faces a substantial likelihood of liability for consciously disregarding their responsibility under the LTIPs to obtain stockholder approval for the Amendment.  This argument rests on Plaintiff's belief that, under the LTIPs, stockholder approval was "plain[ly] and unambiguous[ly]" required for the Amendment.[17]

(12)   We do not share that belief.  Delaware directors are presumed to act in good faith.[18]  To rebut this presumption, Plaintiff must show that the directors acted improperly with scienter, such as an intentional dereliction of duty or a conscious

---

[15] B198 (Special Committee Resolution at 1).

[16] B199 (Special Committee Resolution at 2).

[17] *See* Opening Br. at 40–46 (citing *Garfield v. Allen*, 277 A.3d 296, 322 (Del. Ch. 2022); *Pfeiffer v. Leedle*, 2013 WL 5988416, at *6 (Del. Ch. Nov. 8, 2013)).

[18] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006).

disregard of responsibilities.[19]    Although Section 5(c) of the LTIPs required

stockholder approval for amendments, it expressly carved out stockholder approval

for spinoffs.[20]    Although the parties disagree whether the Amendment should be

treated separately from the spinoff transaction, we conclude that it was reasonable

for the Demand Board to believe that the Amendment was undertaken in connection

with the spinoff and therefore no stockholder vote was required.  The Amendment

---

[19] *McElrath v. Kalanick*, 224 A.3d 982, 991–92 (Del. 2020).  *See also Zuckerberg,* 262 A.3d at 1053 (discussing an "intentional dereliction of duty" or a "conscious disregard" of board responsibilities as amounting to bad faith).

[20] The LTIPs are substantively identical.  Section 5(c) of the UTC 2018 LTIP provides that, in general, amendments require stockholder approval:

> In no event may any Stock Appreciation Right or Stock Option granted under this Plan be amended, *other than pursuant to Section 3(e)*, to decrease the exercise price thereof, be cancelled in exchange for cash or other Awards or in conjunction with the grant of any new Stock Appreciation Right or Stock Option with a lower exercise price, or otherwise be subject to any action that would be treated, under the Applicable Exchange listing standards or for accounting purposes, as a "repricing" of such Stock Appreciation Right or Stock Option, unless such amendment, cancellation or action is approved by the Corporation's shareholders.

B5 (2018 UTC LTIP § 5(c)) (emphasis added).  But Section 5(c) provides an express carveout to the stockholder approval requirement for actions taken pursuant to Section 3(e).  Section 3(e)(ii) provides:

> In the event of a . . . spinoff . . . the Committee or the Board shall make such substitutions or adjustments as it deems appropriate and equitable to: (A) the aggregate number and kind of Shares or other securities reserved for issuance and delivery under this Plan; (B) the various maximum limitations set forth in Section 3(c) applicable to the grants to individuals of certain types of Awards; (C) the number and kind of Shares or other securities subject to outstanding Awards; (D) financial goals or measured results to preserve the validity of the original goals set by the Committee; and (E) the exercise price of outstanding Awards.

B4 (2018 UTC LTIP § 3(e)(ii)).

8

was approved in connection with the spinoff after stock market volatility resulted in an "unexpected" conversion.[21]  Further, it was the product of an extensive process involving outside advisors and a special committee to evaluate the need for an adjustment to the original conversion formula—again, all in connection with the spinoff.  Given the LTIPs' express exemption for spinoffs from the stockholder approval requirement and our review of the record below, we disagree that the Demand Board violated a "plain and unambiguous" provision in the LTIPs.  Because this claim wholly rests on a violation of the LTIPs, the complaint fails to contain particularized and well-pleaded allegations of bad faith conduct by the Demand Board.  Accordingly, demand is not excused.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery is AFFIRMED.

BY THE COURT:

*/s/ N. Christopher Griffiths*
Justice

---

[21] *Letter Opinion* at \*3.

9