# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DAVID ROSTOV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-0648-KSJM |
| | ) | |
| ALCON RESEARCH, LLC; | ) | |
| JEANNETTE BANKES; THOMAS | ) | |
| FRINZI; THOMAS HUDNALL; JOE | ) | |
| RAPPON; DEERFIELD PRIVATE | ) | |
| DESIGN FUND V, L.P.; DEERFIELD | ) | |
| HEALTHCARE INNOVATIONS | ) | |
| FUND II, L.P.; PETRICHOR | ) | |
| OPPORTUNITIES FUND I LP; and | ) | |
| PETRICHOR OPPORTUNITIES | ) | |
| FUND I INTERMEDIATE LP, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AURION BIOTECH, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

1. This derivative action is a spin-off of litigation between rival stockholders of nominal defendant Aurion Biotech, Inc. The court assumes the reader's familiarity with the prior actions between the parties. Those unfamiliar can

review the dockets of those actions[1] and read the court's prior decisions.[2]  For the purposes of this decision, the facts are drawn from the Verified Complaint (the "Complaint") and documents it incorporates by reference.[3]

2.    The rival stockholders are Alcon Research, LLC, on the one hand, and Deerfield Private Design Fund V, L.P. and Deerfield Healthcare Innovations Fund II, L.P. (together, "Deerfield"), on the other.

3.    Alcon and Deerfield invested in Aurion (or the "Company") in a 2022 Series C funding round.  Deerfield purchased 50% of the Series C preferred stock, and Alcon purchased 36%.[4]  Investors holding more than one-third of the Series C shares obtained consent rights over categories of corporate actions, including any charter amendment to alter the number of authorized shares, and any purchase, redemption, or acquisition of shares.

4.    As part of the Series C investment, Alcon, Deerfield, and other preferred stockholders executed a "Voting Agreement" with Aurion.  The Voting Agreement granted each of Alcon and Deerfield the right to appoint one Series C designee to Aurion's then-seven member board of directors (the "Board").[5]  The Voting Agreement

---

[1] *See Alcon Rsch., LLC v. Aurion Biotech, Inc.*, C.A. No. 2024-1102-KSJM ["*Aurion I*"]; *Deerfield Priv. Design Fund V, L.P. v. Alcon Rsch., LLC*, C.A. No. 2025-0201-KSJM ["*Aurion II*"]; *Deerfield Priv. Design Fund V, L.P. v. Alcon Rsch., LLC*, C.A. No. 2025-0204-KSJM ["*Aurion III*"].

[2] *See Alcon Rsch., LLC v. Aurion Biotech, Inc.*, 2025 WL 312371 (Del. Ch. Jan. 27, 2025) ["*Aurion I Opinion*"]; *Aurion II,* Docket ("Dkt.") 31 ("Settlement H'rg Tr.").

[3] C.A. No. 2025-0648-KSJM, Dkt. 1 (Compl.).

[4] *Id.* ¶ 19.

[5] *Id.* ¶¶ 20–22.

also granted Series B investors Petrichor Opportunities Fund I LP and Petrichor Opportunities Fund I Intermediate LP (together, "Petrichor") a Series B Board designee, and granted Series A investors one Board designee.

5. Over time, Alcon acquired Series A and B preferred stock in secondary transactions and secured a second Board designee.[6] Alcon appointed as its Board designees Jeannette Bankes in 2022 and Thomas Hudnall in August 2024.[7]

6. In Section 7.20 of the Voting Agreement, Alcon granted a "Voting Proxy" to Aurion's CEO or CFO, permitting them to vote any shares that Alcon owned in excess of a "Voting Threshold" of 19% of all outstanding shares on an as-converted basis. Section 7.20 also required that the shares in excess of 19% owned by Alcon be voted in a "Neutral Manner," meaning "in the same proportion as the outstanding Series C Preferred Stock of [Aurion] [excluding Alcon's stock] is voted on the relevant matters."[8] No other parties to the Voting Agreement granted Aurion a Voting Proxy.

7. Alcon, Deerfield, and other Series C investors also executed a "Right of First Refusal Agreement," granting the Company the right of first refusal over categories of stock transfers.[9] In a confidential Form S-1 that Aurion filed in anticipation of an IPO, Aurion described the Right of First Refusal Agreement as the

---

[6] Id. ¶ 34.

[7] Id. ¶¶ 14, 16.

[8] Id. ¶¶ 22–24.

[9] Id. ¶ 25; Dkt. 17 ("Defs.' Opening Br."), Ex. 5 ("Right of First Refusal Agreement").

Company's agreement with "certain holders of more than 5% of [Aurion's] outstanding capital stock."[10]

8.      Alcon expressed interest in acquiring Aurion in late 2022.  In March 2023, the Company formed a Special Committee to consider whether to explore a transaction with Alcon, an IPO, and other alternatives.[11]  At a June 2024 meeting, the Board authorized the Special Committee to pursue an IPO.  All but one Board member—Bankes, Alcon's then sole designee—voted in favor.[12]  At the meeting, Bankes stated that "'we' were voting against . . . the IPO."[13]  It is reasonable to infer that "we" referred to Bankes and Alcon.  Bankes left the Board shortly after and Alcon designated Joe Rappon to the vacant position.[14]

9.      In October 2024, Alcon filed suit in this court, seeking a declaration that: (i) the Company could not effect an IPO, either generally or through a reverse stock split, without consent of 66.7% holders of Series C preferred stock; and (ii) Alcon could revoke the Voting Agreement.[15]  On January 27, 2025 in *Aurion I*, the court ruled that the Company could complete the IPO and the reverse stock split, but that Alcon

---

[10] Compl. ¶ 27; Dkt. 22 ("Pl.'s Answering Br."), Ex. 13 (Form S-1) at 214.

[11] Compl. ¶ 31.

[12] *Id.*

[13] *Id.*

[14] *Id.* ¶ 76.

[15] *Id.* ¶ 35.

4

also could terminate the Voting Agreement.[16] The court also awarded Alcon attorneys' fees under the Voting Agreement.[17] The parties appealed.[18]

10. On February 6, the Special Committee announced that it would postpone the IPO.[19] That had the effect of preventing the Board from re-launching any IPO efforts until Aurion secured audited financial statements for year-end 2024.[20] At the time that the Special Committee made its decision, audited financial statements were months away.[21]

11. On February 14, Alcon purchased Series B preferred stock from Petrichor. As a result, Alcon became the Company's controlling stockholder, holding 54% of the Company's outstanding shares on an as-converted basis.[22]

12. Late on February 16, Board chair Thomas Frinzi resigned, allegedly under pressure from Alcon. Frinzi's resignation left the Board with six members—two Alcon designees, one Deerfield designee, the unaffiliated CEO, another unaffiliated director, and Petrichor's Series B designee.[23]

13. Six minutes after Frinzi resigned, Alcon and Petrichor executed a written consent removing Petrichor's Series B Board designee and replacing him with

---

[16] *Id.* ¶ 37; *see Aurion I Opinion*, 2025 WL 312371, at *1, *17.

[17] *Aurion I Opinion*, 2025 WL 312371, at *17.

[18] Compl. ¶ 38.

[19] *Id.* ¶ 41.

[20] *Id.* ¶¶ 39–40.

[21] *See id.*

[22] *Id.* ¶ 44.

[23] *Id.* ¶¶ 48–49.

5

Bankes.[24] The Board then had six members, three of whom were Alcon designees. Alcon and Petrichor also amended the Company's bylaws by written consent, dissolving all Board committees including the Special Committee, and imposing a non-delegable majority Board-vote requirement for the authorization of any Company debt or equity financing (together with Petrichor's February 14 sale to Alcon, the "February Actions").[25]

14. The February Actions prompted Deerfield to file two suits in this court. In the first, *Aurion II*, Deerfield asserted direct and derivative claims for breach of fiduciary duty against Alcon as controlling stockholder, the Company directors, and former Board chair Frinzi for resigning, allegedly to manufacture deadlock. Deerfield requested an injunction prohibiting Alcon from interfering with the Company's ability to pursue an IPO.[26] In the second action, *Aurion III*, Deerfield challenged the Board's composition under 8 *Del. C.* § 225.[27] Alcon filed a derivative counterclaim against Deerfield in *Aurion II*, alleging that a convertible note transaction the Company had entered into with Deerfield was not entirely fair to Aurion stockholders and was invalid under the Company's charter requiring Series C stockholder consent.[28]

---

[24] *Id.* ¶ 48.

[25] *Id.* ¶ 50.

[26] *Id.* ¶¶ 53–55; *Aurion II*, Dkt. 1.

[27] *Aurion III*, Dkt. 1.

[28] Compl. ¶ 56.

6

15. The parties settled *Aurion II* and Deerfield voluntarily dismissed *Aurion III* with prejudice in March 2025.[29] In the *Aurion II* settlement, Alcon purchased all of Deerfield's Series C preferred stock and the challenged convertible notes, making Alcon a 99% stockholder on an as-converted basis.[30] Alcon provided a written consent to amend the convertible notes, which eliminated the more onerous provisions of the notes.[31] After several settlement objections, including from former Company CFO and co-founder David Rostov, who is the plaintiff in this action ("Plaintiff"), the court approved the *Aurion II* settlement but dismissed the derivative claims without prejudice.[32]

16. After *Aurion II* settled, the Company and Alcon stipulated to dismissal of the *Aurion I* appeal.[33] Alcon now controls the Board and has provided the Company with financing.[34]

17. Plaintiff owns stock in Aurion. He believes that Aurion should have pursued an IPO. He brings this action against Bankes, Frinzi, Hudnall, and Rappon (together, the "Director Defendants"), as well as Alcon, Deerfield, and Petrichor (with

---

[29] *Id*. ¶ 57; *Aurion III*, Dkt. 14.

[30] Compl. ¶ 57.

[31] Settlement H'rg Tr. at 54:13–16.

[32] *Id*. at 59:13–20; Compl. ¶¶ 59–60.

[33] Compl. ¶ 63.

[34] *Id*. ¶¶ 71–72.

7

the Director Defendants, "Defendants"), challenging the conduct that gave rise to *Aurion II* and subsequent events.[35]

18.     The Complaint asserts six Counts.

- In Count I (the "Controller Claim"), Plaintiff claims that Alcon and Petrichor breached their fiduciary duties as a control group in connection with the February Actions by dissolving the Special Committee, creating deadlock, and functionally granting Alcon a veto right to block an IPO.[36]

- In Count II (the "Director Claim"), Plaintiff claims that the Director Defendants breached their fiduciary duties by "continually oppos[ing] an Aurion IPO."[37]

- In Count III (the "Frinzi Claim"), Plaintiff claims that Frinzi resigned to create deadlock and block an IPO in breach of his fiduciary duties.[38]

- In Count IV (the "Settlement Claim"), Plaintiff claims that Deerfield, as a derivative plaintiff in *Aurion II*, owed fiduciary duties to Company stockholders and that Deerfield's settlement of *Aurion II* through a buyout of its Company stake breached its fiduciary duties.[39]

- In Count V (the "Entire Fairness Claim"), Plaintiff claims that Alcon breached its fiduciary duties as a controller by causing the Company to dismiss the *Aurion I* appeal, "affirming" the challenged convertible notes by providing Series C approval and causing the Company to abandon IPO plans.[40]

- In Count VI (the "Right-of-First-Refusal Claim"), Plaintiff seeks a declaratory judgment that the stock sales to Alcon from Deerfield and

---

[35] *Id*. ¶¶ 81–104.

[36] *Id*. ¶¶ 81–85.

[37] *Id*. ¶¶ 86–89.

[38] *Id*. ¶¶ 90–93.

[39] *Id*. ¶¶ 94–98.

[40] *Id*. ¶¶ 99–104.

Petrichor are void because the parties did not honor the Company's right of first refusal as required under the Right of First Refusal Agreement.[41]

19. Plaintiff seeks monetary damages for Counts I through V. Plaintiff seeks declaratory relief through Count VI.

20. Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6).[42] The parties completed briefing on November 6, 2025,[43] and the court held oral argument on March 6, 2026.[44]

21. The pleading standard under Rule 12(b)(6) is reasonable conceivability.[45] When considering a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances

---

[41] *Id.* ¶¶ 105–10.

[42] C.A. No. 2025-0648-KSJM, Dkt. 16. Defendants have also moved to dismiss the Complaint under Court of Chancery Rule 12(b)(1), arguing that Plaintiff's claims are both moot and unripe. But Plaintiff seeks monetary relief for Counts I through V, not injunctive or declaratory relief. Defendants do not explain why the resolution of any one of the actions challenged across Counts I through V moots Plaintiff's claims for money damages. The same is true of Defendants' ripeness argument. Plaintiff does not allege that any defendant is presently thwarting an IPO. Rather, Plaintiff alleges that Alcon, Petrichor, and the Director Defendants previously thwarted Aurion's potential IPO. Because this Order grants Defendants' motion to dismiss under Rule 12(b)(6), however, the court does not dilate extensively on the mootness or ripeness arguments.

[43] Dkt. 25.

[44] Dkt. 34.

[45] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

susceptible of proof."[46]  The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[47]

22.    In the Controller Claim, Plaintiff claims that Alcon and Petrichor breached their fiduciary duties as controlling stockholders when they took the February Actions.[48]  Plaintiff's gripe is that the February Actions thwarted an IPO, thereby harming Aurion and Plaintiff.[49]  Plaintiff alleges that Petrichor joined Alcon to manufacture Board deadlock in amending Aurion's bylaws to thwart an IPO.

23.    But according to the Complaint, the IPO was postponed before any of the actions that form the basis of the Controller Claim.  The Complaint alleges that "the Special Committee voted unanimously to postpone the IPO" on February 6, 2025.[50]  The Complaint does not challenge the Special Committee's process or

[46] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[47] *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[48] Compl. ¶¶ 36–52, 81–85.

[49] *See id.* ¶ 85 (Count I: "Aurion and Rostov are both independently and directly damaged by Alcon and Petrichor's thwarting of Aurion's IPO"); *id.* ¶ 89 (Count II: "Aurion and Rostov are both independently and directly damaged by Bankes, Hudnall, and Rappon's thwarting of Aurion IPO"); *id.* ¶ 93 (Count III: "Aurion and Rostov are both independently and directly damaged by this failure of an Aurion IPO"); *id.* ¶ 96 (Count IV: "Deerfield breached its fiduciary duty owed to Aurion and Rostov and used the litigation to enrich itself"); *id.* ¶ 104 (Count V: "Alcon has also harmed Aurion and Rostov by abandoning Aurion's IPO plans.").

[50] *Id.* ¶ 41.

10

independence. The decision to postpone the IPO came before Alcon became a controlling stockholder and before the February Actions.

24. The Complaint seems to fault the Board for not pursuing an IPO after a concededly disinterested and independent Special Committee made the decision to postpone it. The Complaint alleges that "general market conditions remained favorable" for the IPO after the Special Committee's decision.[51] But as of February 6, Aurion could not re-launch any IPO efforts until Aurion secured audited financial statements for year-end 2024.[52] That was months away.[53] And the Complaint pleads no facts from which the court could infer that: Alcon and Petrichor objected to some IPO at some unspecified time in the future, or the IPO was so clearly in Aurion's best interests after the Special Committee determined to postpone it that failing to pursue it would constitute a breach of fiduciary duties. In essence, Plaintiff seeks to hold Alcon and Petrichor liable as controllers for Aurion's inaction. Even assuming that claim is legally viable, then more must be alleged to support it.[54] The Controller Claim is dismissed.

---

[51] Compl. ¶ 40.

[52] *Id.* ¶¶ 39–40.

[53] *See id.*

[54] If Plaintiff argues that Alcon's pre-February 6 conduct caused the Special Committee to postpone the IPO, that argument also fails. The Complaint does not allege any nefarious actions Alcon took before February 6. And Plaintiff does not allege that Alcon was a controlling stockholder before it purchased Petrichor's stake on February 14.

25.     In the Director Claim, Plaintiff asserts that Director Defendants breached their fiduciary duties by acting at Alcon's direction to prevent the Company from pursuing an IPO. Plaintiff generally alleges that the Director Defendants were placed on the Board by Alcon to create a three-to-three deadlock over an IPO, and that they did so for Alcon's benefit rather than the Company's.[55] Plaintiff points to Bankes's statement in June 2024 that "we"—presumably a reference to Alcon—were voting against an IPO to suggest that Bankes was voting according to Alcon's direction at all times.[56] And Plaintiff argues that the Director Defendants' refusal to authorize an IPO constitutes "conscious inaction" that was a fiduciary breach.[57]

26.     Plaintiff's theory against the Director Defendants has a lot of problems. For one, Plaintiff does not identify any Board decision on which the Board deadlocked. Also, because the Director Defendants are protected by an exculpatory charter provision,[58] Plaintiff must plead that each of the Director Defendants acted in bad faith to support a claim against them.[59] The Complaint does not allege facts as to each Director Defendant; it suffers from group pleading issues.[60] Plaintiff's theory

---

[55] *Id.* ¶¶ 48, 49.

[56] *Id.* ¶ 31.

[57] Pl.'s Answering Br. at 33.

[58] Defs.' Opening Br., Ex. 2 at 28.

[59] *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).

[60] *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018) ("When a plaintiff seeks to hold multiple directors protected by an exculpatory provision liable for breach of fiduciary duty, that plaintiff must well-plead a loyalty breach against each individual director; so-called 'group pleading' will not suffice.").

12

also suffers the same problem as the Controller Claim—it challenges Board inaction. The Complaint lacks any allegations sufficient to support an inference that the Director Defendants acted in bad faith by consciously failing to act.

27. The Director Claim also relies on the assumption that pursuing an IPO was the best and only path forward for Aurion. Delaware law does not permit the court to substitute Plaintiff's business judgment for that of the Board. Under Delaware law, directors are presumed to act in good faith, and a minority stockholder's disagreement with a Board's decision does not, standing alone, rebut that presumption.[61] Without more, a director's position as to a transaction does not evidence bad faith merely because a stockholder thinks that position is wrong.[62] The "we" statement attributed to Bankes also does not support a reasonable inference of bad faith. A single plural pronoun, without additional facts, is insufficient to overcome the presumption of good faith. The Director Claim is dismissed.

28. In the Frinzi Claim, Plaintiff asserts that Board chair Frinzi breached his fiduciary duties by resigning from the Board two days after Alcon purchased Petrichor's stake and six minutes before Alcon and Petrichor executed the written consents as part of the February Actions. This paved the way for an even-numbered, deadlocked Board. Plaintiff argues that this timing makes it reasonably conceivable

---

[61] *Warshaw v. Calhoun*, 221 A.2d 487, 493 (Del. 1966).

[62] *Brehm v. Eisner*, 746 A.2d 244, 266 (Del. 2000) ("But where, as here, there is no reasonable doubt as to the disinterest of or absence of fraud by the Board, mere disagreement cannot serve as grounds for imposing liability based on alleged breaches of fiduciary duty and waste." (citation omitted)).

13

that Frinzi resigned to facilitate Board deadlock.[63]  But directors are free to resign from boards.  The act of resigning, without more, generally would not give rise to a breach of the duty of loyalty, absent unusual circumstances like those alleged in *In re Puda Coal, Inc. Stockholders Litigation*.[64]

29.    In *Puda Coal*, the board had confirmed through an internal investigation that the CEO, who was also a director, stole company assets, but they declined to file suit against the CEO.[65]  Stockholders filed derivative complaints against the directors, claiming that they breached their fiduciary duties by failing to take remedial measures.  After the stockholder plaintiffs filed suit, all directors but the CEO resigned.  They then filed a motion to dismiss the complaint under Rules 23.1 and 12(b)(6).[66]  The court denied the motion to dismiss under Rule 23.1, citing the resigning directors' gamesmanship and their decision to leave the company in the sole hands of the "principal suspected wrongdoer" as a basis for conducting a demand futility analysis on the board as it existed after the resignations.[67]  Relevant to this analysis, the court also denied the motion to dismiss under Rule 12(b)(6), noting that the "extreme circumstances . . . might well constitute" a breach of fiduciary duty.[68]

---

[63] Compl. ¶ 49; Pl.'s Answering Br. at 35.

[64] *In re Puda Coal, Inc. S'holders Litig.*, C.A. No. 6476-CS, at 23:3–17 (Del. Ch. Feb. 6, 2013) (TRANSCRIPT).

[65] *Puda Coal*, at 8:3–7, 15:21–16:12.

[66] *Id.* at 16:14–23.

[67] *Id.* at 6:16–17.

[68] *Id.* at 23:3–17.

30.     Frinzi's resignation does not compare to the circumstances of *Puda Coal*. Plaintiff does not allege that Frinzi had actual knowledge of wrongdoing at the Company and chose to resign rather than cause the Company to resolve the matter. The Frinzi Claim is dismissed.

31.     In the Settlement Claim, Plaintiff asserts that Deerfield breached a fiduciary duty it owed to other stockholders—a duty that allegedly arose when Deerfield became a derivative plaintiff in *Aurion II*—by settling that action in exchange for a buyout of its Company stock and a release of Alcon's counterclaims against it.[69]  But the derivative claims in *Aurion II* were dismissed without prejudice to the right of other stockholders to assert similar claims.[70]  Any benefits Deerfield received from the *Aurion II* settlement, therefore, cannot have resulted from the dismissal of derivative claims with prejudice.

32.     Plaintiff further alleges that Deerfield received a control premium from its sale to Alcon.[71]  But elsewhere in the Complaint, Plaintiff alleges that Alcon became a controlling stockholder before *Aurion II* when it purchased Petrichor's stock in the Company.[72]  This allegation contradicts Plaintiff's control-premium theory in a way that renders the Settlement Claim unviable.  The Settlement Claim is dismissed.

---

[69] Compl. ¶¶ 96–98.

[70] Settlement H'rg Tr. at 59:13–20.

[71] Compl. ¶ 96.

[72] *Id.* ¶ 44.

33. In the Entire Fairness Claim, Plaintiff challenges three of Alcon's post-*Aurion II* actions as unfair. First, Plaintiff takes issue with Alcon causing the Company to stipulate to a dismissal of *Aurion I*. Plaintiff claims that the dismissal was a self-interested transaction that benefited Alcon at the stockholders' expense because a successful appeal would have permitted Aurion to pursue an IPO.[73] Second, Plaintiff alleges that Alcon interfered to block an IPO that would have benefited stockholders. Third, Plaintiff alleges that Alcon harmed the Company by using its Series C consent right to cause Aurion to "affirm" the convertible notes that Alcon purchased from Deerfield, and by and extending the term of those notes.[74]

34. Each of Plaintiff's theories flounders on issues that infect Plaintiff's other claims. Once again, Plaintiff's own allegations contradict his argument that the *Aurion I* dismissal harmed the Company. The Complaint states that, by the time the Company stipulated to dismiss *Aurion I*, the IPO had already been postponed.[75] Plaintiff's general claim regarding an abandoned IPO fails for the same reasons the Controller and Director Claims fail. Plaintiff makes no allegations linking Alcon's conduct to the postponement or abandonment of any IPO plans.

35. Plaintiff's allegations regarding the convertible notes are also insufficient to support a claim of fiduciary misconduct. The Complaint alleges that in *Aurion II*, Alcon claimed that the notes' terms were unfair. And indeed, the

---

[73] Pl.'s Answering Br. at 48.

[74] Compl. ¶¶ 70–71.

[75] *Id.* ¶ 41.

16

*Aurion II* parties amended the notes as part of the settlement. Yet Plaintiff makes no allegations as to why the notes are unfair as amended. The only allegation supporting Plaintiff's theory is that the Company was performing well at the time of the amendment and therefore could have obtained financing on "more favorable terms."[76] But conclusory assertions stemming from Plaintiff's disagreement with the Company's business decision cannot, without more, make Plaintiff's claim reasonably conceivable. The Entire Fairness Claim is dismissed.

36. In the Right-of-First-Refusal Claim, Plaintiff seeks a declaratory judgment that the preferred stock transfers from Petrichor and Deerfield to Alcon are void because the Company was not given the right of first refusal as required under the Right of First Refusal Agreement.[77]

37. Under Section 2.1 of the Right of First Refusal Agreement, "Key Holders" of Company stock "unconditionally and irrevocably grant[] to the Company a Right of First Refusal to purchase . . . Transfer Stock."[78] This language applies to Key Holders. The agreement defines "Key Holders" as the persons listed on Schedule B.[79] But Schedule B is blank.[80] The Right of First Refusal Agreement lists Alcon, Petrichor, and Deerfield in Schedule A as "Investors," a designation not subject to Section 2.1.[81]

---

[76] *Id.* ¶ 71.

[77] Compl. ¶¶ 105–10.

[78] Right of First Refusal Agreement § 2.1(a).

[79] *Id.* § 1.12.

[80] *Id.*, Schedule B.

[81] *Id.*, Schedule A.

38.    Plaintiff argues that the blank schedule was an error and that the Company's Form S-1 makes it reasonably conceivable that Section 2.1 was intended to apply to Petrichor and Deerfield.[82]   But Petrichor and Deerfield were left off Schedule B, despite their inclusion in Schedule A.  Aurion's statement in the Form S-1 that "certain holders of more than 5% of [Aurion's] outstanding capital stock" were parties to the Right of First Refusal Agreement does not necessitate the inference that Petrichor and Deerfield intended to be Key Holders.[83]   The Form S-1 does not specify which stockholders were subject to the agreement, nor does it describe the terms those "certain" stockholders were subject to.[84]

39.    Even assuming the parties intended for Petrichor and Deerfield to be Key Holders, other terms of the agreement demonstrate that Petrichor's and Deerfield's sales to Alcon were not subject to the right of first refusal.

40.    Each of Petrichor's and Deerfield's sales to Alcon involved preferred stock.  But Section 2.1 applies only to "Transfer Stock," and the definition of Transfer Stock does not include preferred stock.  The definition of "Transfer Stock" excludes "any shares of Preferred Stock or of Common Stock that are issued or issuable upon conversion of Preferred Stock."[85]

---

[82] Pl.'s Answering Br. at 38–39.

[83] Form S-1 at 214.

[84] *Id.*

[85] Right of First Refusal Agreement § 1.22.

41. Plaintiff asks the court to interpret the phrase "that are issued or issuable upon conversion of Preferred Stock" as applying to both of the preceding terms, "Preferred Stock" and "Common Stock."[86] But that is not a reasonable interpretation of the agreement. Under Plaintiff's construction, Transfer Stock would exclude both (i) common stock issued upon conversion of preferred stock; and (ii) preferred stock issued upon conversion of preferred stock. The latter is a nonsensical category. The only natural reading, consistent with the last-antecedent rule, is that two categories of stock are excluded from the definition of Transfer Stock: (i) preferred stock; and (ii) common stock issued or issuable upon conversion of preferred stock. Accordingly, Petrichor's and Deerfield's sales to Alcon are not Transfer Stock and therefore not subject to Section 2.1. The Right-of-First-Refusal Claim is dismissed.

42. Defendants' Rule 12(b)(6) motion is GRANTED.

/s/ *Kathaleen St. J. McCormick*
Chancellor Kathaleen St. J. McCormick
Dated: June 26, 2026

---

[86] Pl.'s Answering Br. at 37–38.